## CLARK, General Treasurer of Rhode Island, *v.* BARNARD & Others, Assignees.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

Decided May 7th, 1883.

*Bond—Constitutional Law—Corporations—Damages—Franchises—Penalty.*

1. The B. H. & E. Railroad, a corporation created by the State of Connecticut, purchased the franchises and railroad of the H. P. & F. Railroad, a corporation created under the laws of Rhode Island and Connecticut. The legislature of Rhode Island ratified the sale, and authorized the B. H. & E. Company to exercise the rights, privileges, and powers of the H. P. & F. Company: *Held*, That the B. H. & E. Company thereby became the legal successor of the H. P. & F. Company in Rhode Island; and, in respect to its railroad in Rhode Island, a corporation of that State.

2. The State of Rhode Island authorized by an act of its legislature the B. H. & E. Company to extend within the limits of the State the road thus acquired. The act further contained the following proviso: "This act shall not go into effect unless the said B. H. & E. Company shall, within ninety days from the rising of this general assembly, deposit in the office of the general treasurer their bond, with sureties satisfactory to the governor of this State, in the sum of $100,000, that they will complete their said road before the first day of January, A. D. 1872." Within the time named the requisite bond was filed in the sum of $100,000 conditioned as follows: "Now, therefore, if said B. H. & E. Company shall complete their said railroad before the first day of January, A. D. 1872, then the aforewritten obligation shall be void; otherwise be and remain in full force and effect;" and as the requisite security for the payment of the bond, a loan certificate of the city of Boston for $100,000 was deposited with the State treasurer. The B. H. & E. Company became bankrupt.

The assignees in bankruptcy filed a bill in equity to restrain the treasurer of the State from collecting the certificate. The treasurer demurred, on the ground that the real party in interest was the State. In the course of the proceedings the money was paid into court on an interlocutory decree. The State then came in and claimed it: *Held*, (1.) That the voluntary appearance by the State disposed of the demurrer and conferred jurisdiction to adjudicate upon the rights of the State. The case distinguished from *Georgia* v. *Jesup*, 106 U. S. 458. (2.) That the sum named in the bond in question was not a penalty to secure the performance of a condition, which could be discharged on payment of such damages as might be proved to have arisen from non-performance; but that it was in the nature of a statutory penalty for the non-performance of a statutory duty, and that it was not necessary for the State to show any actual damage or injury from the breach, in order to be entitled to recover when the breach was proved. The law and cases on this subject considered and reviewed.

Bill in equity by the assignees in bankruptcy of the Boston, Hartford & Erie Railroad to restrain the treasurer of the State of Rhode Island from receiving $100,000 in the possession of the court, the proceeds of a loan certificate of the city of Boston, which was lodged with the State by the bankrupt as security for the performance of its bond for that amount given to the State in pursuance of law to secure the construction of an extension of its road in Rhode Island, the extension never having been made. The facts appear in detail in the opinion of the court. The main questions discussed in argument were: The power of the corporation to make the agreement with the State; the rights of the parties in the absence of the State; the effect of an appearance by the State for the purpose of claiming the fund after it had been paid into court; and the measure of damages on the breach of the condition of the bond.

*Mr. Charles Hart* and *Mr. William G. Roelker* for the appellants.

*Mr. Robert R. Bishop* and *Mr. John C. Gray* for the appellees.—I. In this suit the State is not a party to the record. Even if Clark had been described as treasurer, the suit would not have been against the State. Still less will it be so, when he is sued simply as an individual. *Osborn* v. *Bank of United States*, 9 Wheat. 738, 857, 858; *Davis* v. *Gray*, 16

Wall. 203, 220; *The Arlington Case* (*United States* v. *Lee*), 106 U. S. 196; *Governor of Georgia* v. *Madrazo*, 1 Pet. 110, 122, 123. The plaintiffs could have recovered in this suit, even if the State of Rhode Island had not appeared. For the fact that it cannot be made a party defendant is sufficient reason for not making it a party defendant, and the bill cannot therefore be objected to for want of parties. *Attorney-General* v. *Baliol College*, 9 Mod. 409; *Osborn* v. *Bank of United States*, 9 Wheat. 738, 846, 847; *Davis* v. *Gray*, 16 Wall. 203. But the State has appeared voluntarily and claimed the fund, and has thereby submitted itself to the jurisdiction of the court. *Brunswick* v. *Hanover*, 6 Beav. 1, 39. Interpleader will lie against the Crown, *Reed* v. *Stearn*, 1 L. T. (N. S.), 539; *S. C.* 6 Jur. 267; and the position of affairs in this case is like that which would arise in an interpleader suit. See *Lariviere* v. *Morgan*, L. R. 7 Ch. App. 550, 560. The State, having voluntarily appeared and claimed the fund in court, cannot take any objections to the want of jurisdiction over it, or to the form of the proceedings, or to the manner in which the fund has got into court, except so far as it has reserved the right to do this by inserting these words in its appearance and claim—" without prejudice to the demurrer of said general treasurer." The demurrer of the treasurer asked that he might be dismissed from the suit, because the suit was really against the State of Rhode Island. The treasurer is entitled to the judgment of this court on the soundness of that demurrer, notwithstanding the appearance of the State. The appearance and claim of the State is not to debar the treasurer of the right of taking the judgment of this court upon the soundness of his demurrer. That is the effect of the words " without prejudice to the demurrer of said general treasurer," and that is their only effect. The demurrer is clearly bad, for the ground that the whole transaction was *ultra vires* is taken on the bill; and *Osborn's Case* is conclusive that, if the delivery was without authority, the bill can be maintained against the treasurer.—II. The acceptance by the company of the act of Rhode Island is void as *ultra vires*. The Boston, Hartford & Erie Company was chartered by the State of Connecticut. The general rule of

law is clear: A corporation chartered in one State cannot do acts in another State which are not authorized by the charter, although they are permitted by such other State. The rules to be applied to the construction of corporate grants are well known. "A corporation created by statute can exercise no powers, and has no rights except such as are expressly given or necessarily implied." *Huntington* v. *Savings Bank*, 96 U. S. 388, 393. A corporation can make no contracts and do no acts, either within or without the State which creates it, except such as are authorized by its charter. *Bank of Augusta* v. *Earle*, 13 Pet. 519, 588, 589; *Cleveland, &c., Railroad Company* v. *Speer*, 56 Penn. St. 325. See *Pierce* v. *Crompton*, Sup. Ct. R. I. Index Decisions, March T. 1881, p. 18. Indeed, unless authorized to do so expressly, or by necessary implication, it can do no acts at all outside of the incorporating State. *Bank of Augusta* v. *Earle*, 13 Pet. 589. The reason why acts done without authority outside of the incorporating State are *ultra vires* is precisely the same as the reason why acts done inside of the State without authority are *ultra vires;* namely, that the capital stock of a corporation is in the nature of a trust fund. *Upton* v. *Tribilcock*, 91 U. S. 45–48; *Great Eastern Railway Company* v. *Turner*, L. R. 8 Ch. App. 149, 152. The terms of the trust being that it shall be used for the purposes specified in the charter, and for no other purposes: (1) In the interest of the public, that the ability of the corporation to render to the public those benefits in consideration of which the corporate privileges were granted may not be impaired; *Pearce* v. *Madison, &c., Railroad Company*, 21 How. 441, 443; *East Anglian Railways Company* v. *Eastern Counties Railway Company*, 11 C. B. 775, 812; (2) In the interest of the creditors of the corporation, that the fund, to which alone they can look for the payment of their debts, shall not be wasted by being applied in any other manner than that authorized by the charter. *Upton* v. *Tribilcock, ubi sup.*; *Ashbury, R. C. & I. Company* v. *Riche*, L. R. 7 H. L. 653, 667, 678, 687, 691, per Lords Cairns, Chelmsford, Hatherley, and O'Hagan.—III. The State of Rhode Island can recover on the bond in question, if valid, only the damage it proves that it has really sustained

from the failure to build the road. The obligation imposed by
a bond is a matter perfectly familiar not only to lawyers,
but to every business man. It is that the obligor is bound
for the damages caused by the breach of the condition, to
an amount not exceeding the penal sum, and that the penal
sum is not itself due on a breach. This is as well known
as that a bill of exchange payable to order is negotiable.
Equity construed a bond, according to the original intent, to
be an obligation to perform the condition, and accordingly held
that the obligee was entitled to a decree directing the obligor
to specifically perform the act set forth in the condition.
*Anonymous*, Mosely, 37 ; *Holtham* v. *Ryland*, 1 Eq. Cas.
Abr. 18, pl. 8 ; *Parks* v. *Wilson*, 10 Mod. 515, 517, 518 ; *Hobson* v. *Trevor*, 2 P. Wms. 191. Counsel also cited *Tall* v.
*Ryland*, 1 Ch. Cas. 183 ; *Benson* v. *Gibson*, 3 Atk. 395 ; *Hardy*
v. *Martin*, 1 Cox, 26 ; *S. C.* 1 Bro. C. C. 419, note † ; *Sloman* v.
*Walter*, 1 Bro. C. C. 418 ; *Errington* v. *Aynesly*, 2 Bro. C. C.
341 ; *Bertie* v. *Falkland*, 3 Ch. Cas. 129, 131 ; *Reynolds* v. *Pitt*,
19 Ves. 134, 142 ; *Hill* v. *Barclay*, 16 Ves. 402, 404. There
are no late cases in equity on bonds, because the doctrines of
equity have been taken up into the common law by virtue of
statutes, of which 8 & 9 Wm. III., c. 11, § 8, was the first.
That statute was entitled " An Act for preventing frivolous
and vexatious suits," and provided that in all actions on any
bonds or on any penal sums for the non-performance of covenants, agreements, etc., the plaintiff might assign as many
breaches as he pleased, and the jury should assess the damages
caused by such breaches ; that judgment should be given for
the penal sum, but on payment of the damages assessed by the
jury there should be a stay of execution, and the judgment
should stand as security for future breaches. That statute was
practically inoperative until 1790 ; for, until then, it was
assumed that it was not compulsory, and that the plaintiff had
the right to elect whether to proceed under the statute or not.
But, in 1790 it was definitely settled that, the main object of
the statute being to relieve obligors, *Savile* v. *Jackson*, 13 Price,
715, 719 ; *Smith* v. *Bond*, 10 Bing. 125, 131, it was to be constructed liberally and to be compulsory, *Hardy* v. *Bern*, 5 T.

R. 636 ; *Roles* v. *Rosewell*, ib. 538.; and to include all bonds, except those against which courts of law could relieve under other statutes without the intervention of a jury. *Roberts* v. *Mariett*, 2 Wm's Saunders, Edition of 1845, p. 187, note 2 ; *Collins* v. *Collins*, 2 Burr. 820 ; *Welch* v. *Ireland*, 6 East, 613 ; *Smith* v. *Bond, ubi supra;* Leake's Digest of Law of Contracts, 144, 1083. The practical effect of this statute was to adopt the rule in equity, and was concisely stated by Baron Parke in *Beckham* v. *Drake*, 2 H. L. 579, 629 : " That statute in effect makes the bond a security only for the damages really sustained." The exact effect of 8 & 9 W. III., c. 11, § 8, is to prescribe that, in every action brought in England on a bond conditioned for a collateral act, nothing should be recovered but the damages proved to have been really sustained by the failure to perform that collateral act. The several States, including Rhode Island, have passed statutes in substance like the English statute. It is unnecessary to consider them particularly, because the U. S. Rev. Stat. § 961, is explicit. "In all suits brought to recover the forfeiture annexed to any articles of agreement, covenant, bond, or other specialty, where the forfeiture, breach, or non-performance appears by the default or confession of the defendant, or upon demurrer, the court shall render judgment for the plaintiff to recover so much as is due according to equity. And, when the sum for which judgment should be rendered is uncertain, it shall, if either of the parties request it, be assessed by a jury." Accordingly, neither in England nor America, neither in equity nor under the statutes, has the penalty of a bond been considered as liquidated damages. In some cases where a bond has been given not to commit a crime, *e. g.*, not to defraud the revenue, equity has refused to interfere, not because the penalty is liquidated damages, but because the penalty is the punishment imposed for committing a crime. See *Benson* v. *Gibson*, 3 Atk. 395, 396 ; *Treasurer* v. *Patten*, 1 Root. 260 ; *United States* v. *Montell*, Taney Dec. 47. There are some cases in which the obligee of a bond has been allowed to recover a sum equal to the penalty ; but this has not been because the *penalty* was liquidated damages, but because the *condition* provided that such

sum should be paid as liquidated damages. The contract was to pay the sum named in the condition, and the penalty stood as usual as security for this payment. *Fletcher* v. *Dyche*, 2 T. R. 32; *Mercer* v. *Iring*, E. B. & E. 562; *Cotheal* v. *Talmage*, 9 N. Y. 551; *Smith* v. *Smith*, 4 Wend. 468; *Bagley* v. *Peddie*, 16 N. Y. 469; *Chase* v. *Allen*, 13 Gray, 42; *Leary* v. *Laflin*, 101 Mass. 334; *Hodges* v. *King*, 7 Met. 583; *Gowen* v. *Gerrish*, 15 Maine, 273. In conclusion, therefore, it is clear that, from a period at least as early as the year 1650, down to the present time, bonds have constituted a distinct class of instruments, the effect of which is always the same, in the same sense that the effect of a conveyance to A and his heirs is always the same. Such is the rule of equity. Such was the effect of the statutes.

Mr. Justice MATTHEWS delivered the opinion of the court.

The appellees, who were complainants below, filed their bill in equity, as assignees in bankruptcy of the Boston, Hartford & Erie Railroad Company, against Samuel Clark, general treasurer of the State of Rhode Island, and the city of Boston and Frederick U. Tracey, its treasurer. The bill alleged that the Boston, Hartford & Erie Railroad Company was a corporation created by the States of Connecticut and Massachusetts for the purpose of building, acquiring, and operating a railroad from Boston in Massachusetts to Willimantic in Connecticut, and from Providence in Rhode Island to Willimantic, and from Willimantic through Waterbury to the State line of Connecticut, and thence to Fishkill in New York; that the directors of the company, without authority from the corporation or by law, applied to the legislature of Rhode Island in 1869, and obtained the passage of an act entitled "An Act in addition to an act to ratify and confirm the sale of the Hartford, Providence & Fishkill Railroad to the Boston, Hartford & Erie Railroad Company," by which the company was authorized to locate and construct a railroad in extension of their line of railroad purchased of the Hartford, Providence & Fishkill Railroad Company, commencing at their depot in Providence, thence running to the easterly line of the State in or near the village

of Valley Falls, to meet and connect with a Massachusetts railroad extending through North Attleborough from Boston, so as to make a continuous line of railroad in a northerly and southerly direction between Providence and Boston; that this act contained a provision in the following terms:

" This act shall not go into effect unless the said Boston, Hartford & Erie Railroad Company shall, within ninety days from the rising of this general assembly, deposit in the office of the general treasurer their bond, with sureties satisfactory to the governor of this State in the sum of one hundred thousand dollars, that they will complete their said road before the first day of January, A. D 1872."

That this condition was not complied with, and that the said act therefore never took effect and is wholly null and void; that, after the passage of the act, the directors and officers of the corporation, without authority and in abuse of their trust and duty, filed with one Samuel Parker, then the general treasurer of Rhode Island, a paper, purporting to be the bond of the corporation, but without sureties, and fraudulently took of the funds of the corporation the sum of $100,000 and deposited the same with the city treasurer of Boston in exchange for the obligation of that city, a copy of which is as follows:

" Temporary Loans, City of Boston.

" $100,000.                                                                   No. 6.

" This certifies that, for value received, there will be due from the city of Boston, payable at the office of the city treasurer, on demand, after the first day of December next, to the general treasurer of the State of Rhode Island, or order, the sum of one hundred thousand dollars, with interest at the rate of seven per cent. per annum, in current funds.

" This loan being authorized by an order of the city council passed the ninth day of June, eighteen hundred and sixty-nine, to anticipate the income of the present financial year.

" Interest will not be allowed after this note is due.

" June 28, 1869.                    ALFRED T. TURNER, *Auditor*.

" FRED. U. TRACEY, *Treasurer*. NATH'L B. SHURTLEFF, *Mayor*."

That the directors and officers of the company, without consideration and without authority, deposited this certificate and obligation with the said Parker, who received the same without warrant of law, and thereupon held the same to the use of the railroad company; that the corporation never accepted the act of the legislature recited; that the railroad authorized thereby has never been built, nor any work done thereon, nor has the State of Rhode Island, nor any citizen thereof, suffered any damage or loss by reason thereof; that the general assembly of Rhode Island considered that the filing of the certificate and obligation of the city of Boston was not a compliance with the act, and did not ratify the taking of the same till after the bankruptcy of the railroad company; that said bankruptcy was adjudicated on October 21st, 1870, and the complainants became assignees in bankruptcy of said company from that date, and entitled to the money represented by the said certificate; that Samuel Parker having died, the respondent Clark succeeded him as general treasurer of Rhode Island, and came into possession of the said certificate, which, it is alleged, however, he holds wrongfully, and in his individual and not his official capacity, and to the use of the complainants, but which, nevertheless, he threatens to collect and to withhold from them the proceeds thereof.

The prayer of the bill is, "that the said respondent Clark may be decreed to have no right, title or interest in or to the said paper writing A, or in or to the said money so deposited with the said respondent Tracey, or to any part thereof, and that he may be decreed to assign and deliver over the said paper A to your orators, and may be enjoined and restrained from presenting the same to the said respondent Tracey, or to the said city of Boston, or from receiving any money or payment whatsoever thereon or therefor, or any part thereof, or from receiving or holding the said sum of $100,000, or any part thereof, from the said respondent Tracey, or the said city of Boston, and that the said respondent Tracey and the said city of Boston may be decreed to pay over to your orators, as assignees as aforesaid, the said sum of $100,000, with interest thereon, and may be enjoined and restrained from paying the same, or any part thereof

or any money on account thereof, to the said respondent Samuel Clark, the general treasurer of the State of Rhode Island, and that your orators may have such other and further relief as to your honors shall seem meet, and as the nature and circumstances of the case shall require."

To this bill a demurrer was filed by Clark, for want of jurisdiction, on the ground that it was in substance a suit by citizens of one State against the State of Rhode Island. This demurrer was overruled. Clark then filed his answer, denying the material allegations of the bill, asserting that the transaction was with the State of Rhode Island, through the treasurer in his official capacity, and insisting upon the immunity of the State from suit by citizens of other States as a defence. The cause came on for hearing upon the pleadings and proofs, when an interlocutory decree was passed, April 15th, 1878, ordering the payment of the money due from the city of Boston upon the loan certificate into the registry of the court, with liberty to the defendant Clark to take and file evidence in support of any claim for damages by reason of the breach of the bond of the Boston, Hartford & Erie Railroad Company to the State of Rhode Island; and further ordering, that on final hearing, and upon filing in court the certificate of indebtedness, the general treasurer of the State of Rhode Island should have and recover of the said sum in the registry such portion or the whole thereof as should amount to the sum, if any, for which any surety might or for which the principal obligor in said bond would be liable, upon the evidence, either for any penalty or damages by reason of the non-performance and breach of the conditions of said bond.

On May 3d, 1878, the city of Boston paid into court the sum of $100,000, and, in addition, the interest accrued to December 1st, 1869, and subsequently, on February 25th, 1880, an additional amount for interest in full.

On March 17th, 1880, the following claim of the State of Rhode Island was filed by the allowance of the court as of April 15th, 1878, after the entry of the interlocutory decree of that date:

"And now comes the State of Rhode Island, by the undersigned, the same counsel who have appeared for the defendant Clark, general treasurer of said State, and without prejudice to the demurrer of said general treasurer, claims the fund in the registry of the court."

This was signed by counsel.

On final hearing the fund was awarded to the appellees ; and from that decree Clark, general treasurer of the State of Rhode Island, and the State of Rhode Island appealed. The State itself is a party to the appeal bond, which recites that the State of Rhode Island was an intervenor and claimant of the fund in court, and that a decree was rendered against it as such.

The bond executed and delivered by the Boston, Hartford & Erie Railroad Company to the State of Rhode Island is as follows :

"Know all men by these presents that the Boston, Hartford and Erie Railroad Company, a corporation created by the general assembly of the State of Connecticut, is held and firmly bound to the State of Rhode Island and Providence Plantations in the sum of one hundred thousand dollars, to be paid to said State of Rhode Island and Providence Plantations ; to which payment, well and truly to be made, the said corporation doth bind itself and its successors firmly by these presents.

"The condition of the aforewritten obligation is such, that whereas by an act of the general assembly of said State of Rhode Island, entitled ' An Act in addition to an act entitled An Act to ratify and confirm the sale of the Hartford, Providence and Fishkill Railroad to the Boston, Hartford and Erie Railroad Company,' passed at the January session, 1869, said Boston, Hartford and Erie Railroad Company are authorized and empowered to locate, lay out, and construct a railroad, in extension of their line of railroad purchased of the Hartford, Providence and Fishkill Railroad Company, commencing at a point in their said purchased railroad at or near their freight depot in the city of Providence, thence running westerly and northerly by a line westerly of the State's prison a little easterly of the Rhode Island Locomotive Works, and thence by nearly a straight line and crossing or running near to Leonard's Pond, and thence passing between the

villages of Pawtucket and Lonsdale, and over and above the Providence and Worcester Railroad, thence continuing to the easterly line of the State, in or near the village of Valley Falls:

"Now, therefore, if said Boston, Hartford and Erie Railroad Company shall complete their said railroad before the first day of January, A. D. 1872, then the aforewritten obligation shall be void; otherwise be and remain in full force and effect.

"In testimony whereof, said Boston, Hartford and Erie Railroad Company have caused this instrument to be signed by John S. Eldridge, its president, and its corporate seal to be thereto affixed, this twenty-third day of June, 1869.

"[L. S.]   BOSTON HARTFORD AND ERIE R. R. Co.,
     "BY JOHN S. ELDRIDGE, *President*.

"Executed in presence of—
 "SAMUEL CURREY.
 "H. S. BARRY."

The testimony taken in the cause pursuant to the interlocutory decree, it is admitted, failed to prove any damage or loss occasioned to the State of Rhode Island, or to any of its citizens or inhabitants, by reason of the failure of the railroad company to comply with the conditions of this bond.

The first question for determination on this appeal is that of jurisdiction, raised first by the demurrer and afterwards by the answer of Clark, general treasurer of the State of Rhode Island, on the ground that the suit was in effect brought against a State by citizens of another State, contrary to the Eleventh Amendment to the Constitution of the United States.

We are relieved, however, from its consideration by the voluntary appearance of the State in intervening as a claimant of the fund in court. The immunity from suit belonging to a State, which is respected and protected by the Constitution within the limits of the judicial power of the United States, is a personal privilege which it may waive at pleasure; so that in a suit, otherwise well brought, in which a State had sufficient interest to entitle it to become a party defendant, its appearance in a court of the United States would be a voluntary submission to its jurisdiction; while, of course, those courts are always open to it as a suitor in controversies between it and

citizens of other States. In the present case the State of Rhode Island appeared in the cause and presented and prosecuted a claim to the fund in controversy, and thereby made itself a party to the litigation to the full extent required for its complete determination. It became an actor as well as defendant, as by its intervention the proceeding became one in the nature of an interpleader, in which it became necessary to adjudicate the adverse rights of the State and the appellees to the fund, to which both claimed title. The case differs from that of *Georgia* v. *Jesup*, 106 U. S. 458, where the State expressly declined to become a party to the suit, and appeared only to protest against the exercise of jurisdiction by the court. The circumstance that the appearance of the State was entered without prejudice to the demurrer of Clark, the general treasurer, does not affect the result. For that demurrer could not reach beyond the question of the right to sue Clark by reason of his official character, which became insignificant when the State made itself a party; and in point of fact, the bill was framed to avoid the objection, by charging Clark as a wrong-doer in his individual capacity. For the groundwork of the bill, whether it be regarded as directed against the officer or the State, is, that the transaction throughout was void, as *ultra vires* the corporation. And this presents the next question to be considered.

That question arises and is to be determined upon the following statement of facts.

The Boston, Hartford & Erie Railroad Company was originally created a corporation by the laws of Connecticut. Its charter conferred authority upon it in these terms:

"Said Boston, Hartford and Erie Railroad Company may purchase . . . the franchise, the whole or any part of the railway or railway property of any railroad company, located in whole or in part in this State, whose line, or a portion of whose line, of railway, constructed or chartered, now forms part of a railway line from the harbor of Boston, passing through Thompson to Willimantic, and from Providence through Willimantic to Hartford, Waterbury, and thence toward the North River, with

the purpose of reaching a point at or near Fishkill, in the State of New York; . . . and said Boston, Hartford and Erie Railroad Company may make any lawful contract with any other railway company with which the track of said railroad may connect, in relation to the business or property of the same; and may take lease of any railroad, or may lease their railway to, or may make joint stock with, any connecting railway company in the line of, and forming a necessary part of, and running in the same general direction as, their said route, and between its terminal points."

In pursuance of this authority, the Boston, Hartford & Erie Railroad Company purchased the franchises and railroad of the Hartford, Providence & Fishkill Railroad Company. This latter company was a consolidated corporation, deriving its existence and powers from the laws both of Connecticut and Rhode Island, whose road, as defined in the acts of incorporation, constituted a line within the general description contained in the section from the charter of the Boston, Hartford & Erie Railroad Company, already quoted. By a subsequent act of the legislature of Rhode Island, the sale and transfer of the Hartford, Providence & Fishkill Railroad, its property and franchises, to the Boston, Hartford & Erie Railroad Company was ratified and confirmed, so far as said railroad was situated in that State; and it was thereupon further enacted, that the "said Boston, Hartford & Erie Railroad Company, by that name, shall and may have, use, exercise and enjoy all the rights, privileges, and powers heretofore granted and belonging to said Hartford, Providence & Fishkill Railroad Company, and be subject to all the duties and liabilities, imposed upon the same by its charter and the general laws of this State."

The Hartford, Providence & Fishkill Railroad Company was, without question, so far as it owned and operated a railroad within the State of Rhode Island, a corporation in and of that State; and the Boston, Hartford & Erie Railroad Company became its legal successor in that State, as owner of its property, and exercising its franchises therein, and became, therefore, in its respect to its railroad in Rhode Island, a corporation in and of that State.

Thereafter, in January, 1869, the legislature of Rhode Island passed the act out of which the present litigation has grown, entitled " An Act in addition to an act entitled ' An Act to ratify and confirm the sale of the Hartford, Providence & Fishkill Railroad to the Boston, Hartford & Erie Railroad Company.' " In its first section it is enacted as follows:

" The Boston, Hartford and Erie Railroad Company, a corporation created by the general assembly of the State of Connecticut, are hereby authorized and empowered to locate, lay out, and construct a railroad in extension of their line of railroad by them purchased of the Hartford, Providence and Fishkill Railroad Company, commencing at a point in their said purchased railroad at or near their freight depot in the city of Providence, thence running westerly and northerly by a line westerly of the State prison, a little easterly of the Rhode Island Locomotive Works, and thence by nearly a straight line, and crossing or running near to Leonard's Pond (so called), and then passing between the villages of Pawtucket and Lonsdale, and over and above the Providence and Worcester Railroad; thence continuing to the easterly line of the State in or near the village of Valley Falls, there to meet and connect with a railroad extending westerly through North Attleborough, from the direction of Boston, authorized by the Commonwealth of Massachusetts."

The eighth section of the act is as follows :

" Said railroad, when the same shall have been constructed, shall be managed and protected in all respects according to the provisions of, and be subject to, an act entitled ' An Act to incorporate the Providence and Plainfield Railroad Company,' and the several acts in addition to and amendment thereof, and the general laws of the State."

The act thus referred to as the " act to incorporate the Providence & Plainfield Railroad Company," was the charter of the corporation by that name, in the State of Rhode Island, that, by consolidation with a Connecticut company, formed the Hartford, Providence & Fishkill Railroad Company.

The twelfth section of the act, recited in the complainant's bill, is as follows:

"This act shall not go into effect unless the said Boston, Hartford & Erie Railroad Company shall, within ninety days from the rising of this general assembly, deposit in the office of the general treasurer their bond, with sureties satisfactory to the governor of this State, in the sum of one hundred thousand dollars, that they will complete their said road before the first day of January, A. D. 1872."

This act of the legislature of Rhode Island was duly accepted by the stockholders of the Boston, Hartford & Erie Railroad Company; the bond required by the twelfth section, as already set out, was executed and delivered; and the certificate of indebtedness, in lieu of sureties, was given by the company and accepted by the State.

It is now argued by counsel for the appellees, that the party which, in all these transactions, was dealing with the State of Rhode Island was the Boston, Hartford & Erie Railroad Company, in its character as a corporation of the State of Connecticut; that, as such, it had no power, under the charter granted by that State, to build or own a railroad directly connecting Boston and Providence, nor had it, as such, any capacity to receive a grant of such a franchise; that, consequently, everything done or attempted in that behalf was *ultra vires* and void.

But the Boston, Hartford & Erie Railroad Company was also a corporation of Rhode Island. As such, it owned and operated a railroad within that State, and had received and exercised franchises under its laws, to which it was in all respects subject. It was the assignee of the road and rights connected therewith, formerly belonging to the Hartford, Providence & Fishkill Railroad Company; and it was this corporation, dwelling and acting in Rhode Island, that the legislature, by the act in question, authorized to exercise the additional powers it conferred.

If it had had no previous existence as a corporation under the laws of Rhode Island, it would have become such by virtue of the act in question. For although as a Connecticut corpora-

tion, it may have had no capacity to act or exist in Rhode Island for these purposes, and no capacity by virtue of its Connecticut charter, to accept and exercise any franchises not contemplated by it, yet the natural persons, who were corporators, might as well be a corporation in Rhode Island as in Connecticut; and, by accepting charters from both States, could well become a corporate body, by the same name and acting through the same organization, officers and agencies, in each, with such faculties in the two jurisdictions as they might severally confer. The same association of natural persons would thus be constituted into two distinct corporate entities in the two States, acting in each according to the powers locally bestowed, as distinctly as though they had nothing in common either as to name, capital, or membership. Such was in fact the case in regard to this company, so that in Rhode Island it was exclusively a corporation of that State, subject to its laws and competent to do within its territory whatever its legislation might authorize.

"Nor do we see any reason" [as was said by this court, Mr. Justice Swayne delivering its opinion, in *Railroad Company* v. *Harris*, 12 Wall. 65–82], "why one State may not make a corporation of another State, as there organized and conducted, a corporation of its own, *quo ad* any property within its territorial jurisdiction. That this may be done was distinctly held in *The Ohio and Mississippi Railroad Company* v. *Wheeler*, 1 Black, 297."

The same view was taken in *Railway Company* v. *Whitton*, 13 Wall. 270; in *Railroad Company* v. *Vance*, 96 U. S. 450; and in *Memphis and Charleston Railroad Company* v. *Alabama*, 107 U. S. 581. The question of the powers of the Boston, Hartford & Erie Railroad Company, as a corporation in Rhode Island and the legal effect of its acts and transactions performed in that State, is to be determined exclusively by the laws of that State, and not by those of Connecticut, which have no force beyond its own territory. It results, therefore, that the doctrine of *ultra vires*, as here urged by the appellees, has no place in this controversy.

It is, however, urged on behalf of the appellees—and this was the ground on which the decree below proceeded—that the obligation required by the statute and given by the company, was a bond, in the penal sum of $100,000, conditioned that the company would completely build its road within the period limited, upon which no recovery can be had, except for such damages as may be shown to have resulted to the State of Rhode Island from the breach of its condition; that no damage on that account is proven, it being in fact admitted that none actually resulted; that the certificate of indebtedness and the fund which has arisen from its payment, were pledged merely, in lieu of sureties, as collateral security for the satisfaction of the bond; and that, consequently, the claim of the State of Rhode Island against it having thus failed, that fund reverts to the appellees.

The proposition of counsel for the appellees, as stated by them, is, that, "from a period at least as early as the year 1650 down to the present time, bonds have constituted a distinct class of instruments, the effect of which is always the same, in the same sense that the effect of a conveyance to A and his heirs is always the same. Such is the rule of equity. Such was the effect of the statutes. Consequently, if in a particular case, parties have expressed their obligation in the form of a bond, their liability is thereby determined to be an obligation to perform the condition or pay the damages actually sustained from non-performance thereof;" and as a statement of the rule, they cite the following passage, 2 Sedgwick Meas. Dam. (7th ed.) 259, note:

" Of course, in this class of agreements, as in all others, when the contract takes the ordinary form of a penal bond, the sum fixed will invariably be regarded as a penalty; and this might well be put, at the present day, on the ground of intention, as derived from the writing itself, for this form of instrument is in such common use that persons who resort to it must be held to have in view its legal consequences."

While this may be accepted as a sufficiently accurate statement of the general rule, as to bonds with conditions, designed

as an indemnity between private persons for non-performance of a collateral agreement, yet, in respect to such cases, it cannot be considered as universally true.

"It is often a doubtful question" [said the Supreme Judicial Court of Massachusetts in *Hodges* v. *King*, 7 Met. 583–587], "whether the sum stipulated to be paid on the non-performance of a condition is in the nature of a penalty, or is the amount settled by the parties for the purpose of making that certain which would be otherwise uncertain. . . . The bond has indeed a condition; but that is a matter of form and cannot turn that into a penalty which, but for the form, is an agreement to pay a precise sum under certain circumstances."

So that it cannot correctly be said to be true, in all such cases, that the intention to treat the sum named in the bond as a penalty to secure the performance of the condition, and to be discharged on payment of damages arising from non-performance, can be inferred as a rule of law, or a conclusive presumption, from the mere form of the obligation.

Originally, at law, in case of breach of the condition of a bond, the amount recoverable was that named in the obligation. So that, if the condition is impossible either in itself or in law, the obligation remains absolute. As "if a man be bound in an obligation, etc., with condition that if the obligor do go from the church of St. Peter in Westminster to the church of St. Peter in Rome within three hours, that then the obligation shall be void. The condition is void and impossible and the obligation standeth good." So, again, if the condition is against a maxim or rule in law, as, "if a man be bound with a condition to enfeoff his wife, the condition is void and against law, because it is against the maxim in law, and yet the bond is good." Co. Litt. 206 b. So, where the condition is possible at the date of the instrument and becomes impossible subsequently, the obligation does not become thereby discharged, unless the impossibility of performance was the act of God, or of the law, or of the obligee. Accordingly, it was held by this court in *Taylor* v. *Taintor*, 16 Wall. 366, that when a person arrested in one State on a criminal charge, and released under

his own and his bail's recognizance, that he will appear on a day fixed and abide the order and judgment of the court, goes into another State, and while there, is, on the requisition of the governor of a third State, for a crime committed in it, delivered up, and is convicted and imprisoned in such third State, the condition of the recognizance has not become impossible by act of law so as to discharge the bail; " the law which renders the performance impossible, and therefore excuses failure, must be a law operative in the State when the obligation was assumed and obligatory in its effects upon her authorities."

The ground, nature, and limits of the jurisdiction of courts of equity to relieve against penalties in such instruments is well stated by Mr. Justice Story, in this language:

" In short, the general principle now adopted is that, wherever a penalty is inserted merely to secure the performance or enjoyment of a collateral object, the latter is considered as the principal intent of the instrument, and the penalty is deemed only as accessory; and, therefore, as intended only to secure the due performance thereof or the damage really incurred by the non-performance. In every such case the true test generally, if not universally, by which to ascertain whether relief can or cannot be had in equity, is to consider whether compensation can be made or not. If it cannot be made, then courts of equity will not interfere. If it can be made, then, if the penalty is to secure the mere payment of money, courts of equity will relieve the party, upon paying the principal and interest. If it is to secure the performance of some collateral act or undertaking, then courts of equity will retain the bill, and will direct an issue of *quantum damnificatus;* and when the amount of damages is ascertained by a jury, upon the trial of such an issue, they will grant relief upon the payment of such damages." Story's Eq. Jur. § 1314.

And Mr. Adams, in his Treatise on Equity, 6th Am. ed. 107, says, on the same subject:

" The equity for relief against enforcement of penalties originates in the rule which formerly prevailed at law, that, on breach of a contract secured by penalty, the full penalty might be enforced, without regard to the damage sustained. The court of

chancery, in treating contracts as matters for specific performance, was naturally led to the conclusion that the annexation of a penalty did not alter their character ; and, in accordance with this view, would not, on the one hand, permit the contracting party to evade performance by paying the penalty; and, on the other hand, would restrain proceedings to enforce the penalty on a subsequent performance of the contract itself, viz., in the case of a debt, on payment of principal, interest, and costs ; or in that of any other contract, on reimbursement of the actual damage sustained."

It has accordingly been uniformly held, in cases too numerous for citation, that courts of equity will not interfere in cases of forfeiture for the breach of covenants and conditions where there cannot be any just compensation decreed for the breach ; for, as was said by Lord Chancellor Macclesfield, in *Peachy* v. *Duke of Somerset*, 1 Strange, 447; *S. C.* Prec. Ch. 568, 2 Eq. Ca. Abr. 227, " it is the recompense that gives this court a handle to grant relief."

The application of this principle becomes more manifest in cases where a public interest or policy supervenes, as where, for non-compliance by stockholders in corporations engaged in undertakings of a public nature, with the terms of payment of instalments due on account of their shares, by which a forfeiture of the stock and of all previous payments thereon has been incurred and declared, the courts refuse to grant relief. *Sparks* v. *Proprietors of Liverpool Water Works*, 13 Ves. 428 ; *Prendergast* v. *Turton*, 1 You. & Col. Ch. 98 ; *Naylor* v. *South Devon Railway Company*, 1 DeG. & Sm. 32 ; *Sudlow* v. *The Dutch Rhenish Railway Company*, 21 Beav. 43.

In the case of *Sparks* v. *Proprietors of Liverpool Water Works*, 13 Ves. 433, Sir Wm. R. Grant, M. R., said :

" The parties might contract upon any terms they thought fit, and might impose terms as arbitrary as they pleased. It is essential to such transactions. This struck me as not like the case of individuals. If this species of equity is open to parties engaged in these undertakings, they could not be carried on."
. . . " Why is not this equity open to contractors for gov-

ernment loans? Why may not they come here to be relieved when they have failed in making their deposit? And if they could have relief, how could government go on? It would be just as difficult for these undertakings to go on. If compensation cannot be effectually made it ought not to be attempted."

Accordingly, where any penalty or forfeiture is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred, for it would be in contravention of the direct expression of the legislative will. Story's Eq. Jur. § 1326. Lord Chancellor Macclesfield said in *Peachy* v. *Duke of Somerset*, 1 Strange, 447–453:

"Cases of agreements and conditions of the party and of the law are certainly to be distinguished. You can never say the law has determined hardly, but you may that the party has made a hard bargain."

In *Powell* v. *Redfield*, 4 Blatchford, 45, an application was made in equity to restrain suits upon a bond given in pursuance of the revenue laws of the United States, which was denied on the ground that a court of equity had no right to interfere and, by injunction or decree, to virtually repeal the express provisions of a positive statute, or defeat their operation in the particular case. In *Benson* v. *Gibson*, 3 Atk. 395, Lord Hardwick said:

"Nor is it like the case of bonds given as a security not to defraud the revenue, because there, where a person is guilty of a breach, it is considered in law as a crime, and this court will not relieve for that reason."

The case of *Treasurer* v. *Patten*, 1 Root, 260, was an action for the penalty of a bond given to oblige the defendant to observe the laws respecting excise, in which there was a verdict for the plaintiff and the £200 penalty. Defendant moved the court, says the report, to chancer said bond:

"By the court: There is no power short of the legislature can do it; for it is the sum prescribed by an act of the legislature."

So in *Keating* v. *Sparrow*, 1 Ball & Beatty, 367–373, the Lord Chancellor Manners said:

" It has been argued on the part of the plaintiff that this court leans against forfeiture, if the party can be compensated ; and that he can in this case, where interest and septennial fines may be given to the landlord.   That principle is applicable to cases of contract between the parties, but not to the provisions of an act of Parliament or conditions in law."

The fact that the obligation is in the form of a bond to the State does not make its penalty less a statutory forfeiture, and so outside the jurisdiction of a court of equity.   In the case of *The United States* v. *Montell*, Taney, 47, it was held that the sum secured by a bond with sureties, under the act of Congress of December 31st, 1792, ch. 1, sec. 7, 1 Stat. 290, conditioned that the registry of a vessel should be used solely for the vessel for which it was granted, and should not be disposed of to any person whatsoever; and if the vessel be lost, or prevented by disaster from returning to the port, and the registry shall be preserved, or if the vessel be sold, that the registry shall be delivered up to the collector, is a penalty or forfeiture inflicted by the sovereign power for a breach of its laws, not a liquidated amount of damages due under a contract, but a fixed and certain punishment for an offence, and not the less so, because security is taken before the offence is committed, in order to secure the payment of the fine if the law should be violated. Chief Justice Taney, in his opinion, said :

" Penalties and forfeitures imposed by statute are not usually provided for by bond and security given in advance.   The sum recovered from Montell is recovered upon a contract ; the action was brought upon a contract, and was not and could not have been brought in any of those forms which are usually necessary for the recovery of fines or forfeitures imposed by law.   Yet this sum was, in truth, forfeited by Montell, by reason of his violation of a duty imposed by the act of Congress ; it was a specific penalty upon the owner and master, for the commission of a particular offence against the policy of that law.   And although the amount was secured by bond given for the performance of the

duty, yet this duty was a part of the same policy with other duties mentioned in the act and for which other penalties are inflicted. . . .

"It certainly is not to be regarded as a bond with a collateral condition, in which the jury are to assess the damages which the United States shall prove that they have sustained; for according to that construction, the amount of damages would not depend upon the amount of the penalty described in the section, which is graduated according to the size of the vessel, but would depend upon the discretion of different juries, and larger damages might be given where the penalty was only four hundred dollars, than in a case where the penalty was two thousand dollars. This, obviously, is not the intention of the law, and the United States are entitled to recover the whole sum for which the party is bound, if any one of the conditions are broken. Besides, how could the United States prove any particular amount of damages to have been sustained by them in a suit on this bond? What do they lose? It would be difficult, we think, by any course of proof or any process of reasoning, to show that the United States had sustained any particular amount of damages in a case of this description, or to adopt any rule by which the damages could be measured by a jury, or be liquidated by agreement between the parties.

"The sum for which the parties are to become bound, is manifestly a penalty or forfeiture, inflicted by the sovereign power for a breach of its laws. It is not a liquidated amount of damages due upon a contract, but a fixed and certain punishment for an offence. And it is not the less a penalty and a punishment, because security is taken before the offence is committed, in order to secure the payment of the fine if the law should be violated."

Recurring now to the particular circumstances of the present case, with a view to the application of these principles and decisions, we are satisfied that the proper solution of the question now under examination is to be found in two principal considerations.

The first of these is, that it was not intended by the parties, the State of Rhode Island on the one hand, and the Boston, Hartford & Erie Railroad Company on the other, that the ob-

ligation given and accepted should be for an indemnity against any loss or damage expected to be suffered by the State, in the event that the railroad company should fail to build the railroad as required. It is found as a fact that no such loss or damage has in fact ensued. It is equally plain that none could possibly have arisen. The security is not to be extended to any supposed damage to private interests legally affected by the process of constructing the work. All damage of this kind to private persons was carefully provided for in other parts of the act. As to the State itself, the real party to the arrangement and contract, it could gain nothing in its political and sovereign character by the construction of the road, it could lose nothing by the default. If it could be supposed as possible that the State had in view the public interests of commerce and trade in the construction of the proposed railroad, and meant to provide for loss and damage to them by reason of its failure, the obvious answer is that no computation and assessment of actual damages on that account would be practicable, leaving as the alternative that the State, in fixing the penalty of the bond in the statute, had established its own measure of the public loss. The question of damages and compensation was not, because it could not have been, in contemplation of the parties. There was no room for supposing that there could be any. To assume that the statute required this bond and security in this sense, in full view of the legal conclusion which it is said necessarily flows from its form, and that in the event contemplated, of the failure to build the road, all that remained to be done was that the State should hand back cancelled the obligation and security it had been at such pains to exact, is to put upon the transaction an interpretation altogether inadmissible. It would have been, upon such an assumption, a vain and senseless thing, and however private persons may be sometimes supposed to act improvidently, we are not to put such constructions, when it is legally possible to avoid them, upon the deliberate and solemn acts and transactions of a sovereign power, acting through the forms of legislation. The conclusion, in our opinion, cannot be resisted that the intention of the parties in the transaction in question was that, if the railroad should

not be built within the time limited, the corporation should pay to the State, absolutely and for its own use, the sum named in the bond and secured by the deposited certificate of indebtedness. The supposition is not open that the penalty was prescribed merely *in terrorem*, to secure punctuality in performance, with the reserved intention of permitting subsequent performance to condone the default, for a distinct section of the statute (sec. 9) declares that in case of failure to complete the road within the time limited, the act itself should be void and of no effect.

In the second place, we think, that the sum named in the statute is imposed by it as a statutory penalty for the non-performance of a statutory duty. The obligation required is that the railroad company shall give a bond, with satisfactory security, that they will obey the law, that they will complete their road as required by it. The language evidently means that, in case they fail to do so, they shall forfeit and pay the sum named ; and in order to insure its payment, additional parties to the bond, as sureties, are required. It is admitted, that if it does not mean this, it does not mean anything, and we have already said that we are not at liberty to adopt that alternative. We must construe it, *ut res magis valeat quam pereat ;* and the rule of strictness, in the construction of penal statutes, does not require an interpretation which defeats the very object of the law. The State of Rhode Island was dealing with one of its own corporations, and it had perfect right to act upon its own policy and prescribe its own terms, as conditions of powers and privileges sought from its authority.

For these reasons the decree of the circuit court is reversed, and the cause is remanded with instructions to enter a decree in favor of the State of Rhode Island for the sum of $100,000, payable out of the fund in court, with so much interest thereon, if any, as has accrued on that sum since the 1st day of January, 1872, which is the date when the amount became due.

*And it is accordingly so ordered.*