ernment's ownership of the vehicle and Riley's general agency.

The judgment of the District Court will be reversed and the cause remanded for further proceedings consistent with this opinion.

STATE OF IOWA et al., Plaintiffs,

v.

UNION ASPHALT & ROADOILS, INC., et al., Defendants.

In re Application for Attorney Fees Verne LAWYER and Lex Hawkins, Applicants-Appellees,

v.

STATE OF IOWA, Appellant.

No. 19325.

United States Court of Appeals Eighth Circuit.

April 2, 1969.

Richard C. Turner, Atty. Gen. of Iowa, Des Moines, Iowa, for appellants; Roger H. Ivie, Asst. Atty. Gen., Des Moines, Iowa, with him on the brief.

Lex Hawkins, Des Moines, Iowa, for appellees; Verne Lawyer, Des Moines, Iowa, with him on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and BRIGHT, Circuit Judges.

MATTHES, Circuit Judge.

This is an appeal by the state of Iowa from the judgment of the district court awarding Verne Lawyer and Lex Hawkins attorney fees for services rendered appellant and other political subdivisions of that state in connection with antitrust litigation against Union Asphalt & Roadoils, Inc. and 20 other defendants.

The primary question for determination is whether the district court had jurisdiction to entertain and adjudicate the application for allowance of fees. The court, after a plenary hearing on the merits of the claim, concluded it was vested with authority, determined the value of the services rendered and entered the judgment from which this appeal is prosecuted. The court filed a memorandum opinion which is reported sub nom Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391 (D.Iowa 1968). We affirm.

We find no substantial conflict in the pertinent facts. It is readily discernible that the controversy stems from a change of administration of the attorney general's office of Iowa. During the year 1966, Lawrence Scalise was the attorney general. However, at the November, 1966, general election Richard C. Turner was elected to succeed Scalise. Turner assumed the office on January 1, 1967. In June of 1966, Verne Lawyer, a Des Moines attorney, was employed by Scalise to investigate the feasibility of instituting an antitrust action for treble damages against a number of companies which had sold asphalt to the state of Iowa. Apparently, Iowa was encouraged by the success of similar suits filed by other states against asphalt companies. On September 12, 1966, attorney Lex Hawkins was authorized by Scalise to assist Lawyer. After an investigation the two attorneys determined there was a meritorious basis for a treble-damage suit. Thereupon, a written contract of employment (not in record) was executed by Scalise and appellees.

The appellees, acting pursuant to their employment and on the basis of the information they had assembled, prepared a complaint alleging that the defendant asphalt producers and brokers had conspired to and had in fact unlawfully fixed prices for asphalt products sold to plaintiffs (Iowa and other political subdivisions). The complaint was filed in the United States District Court for the Southern District of Iowa on December 6, 1966. There was at least one conference between attorney Lawyer and Turner after the suit was filed and prior to January 1, 1967, relating generally to the merits of the antitrust action.

On January 5, 1967, for the first time, Turner requested appellees to resign. They refused to do so. The attorney general persisted in his demand that appellees withdraw from the case. They complied and on January 9 delivered their files to the attorney general's office. On January 10 they filed application in the district court for an order permitting them to withdraw their appearance in behalf of the plaintiffs. On the same day the district court granted the motion and entered an order providing that for good cause shown appellees were permitted to withdraw their appearance. The order in part recites: "[T]he Court does hereby state that Verne Lawyer and Lex Hawkins have fully and completely discharged their legal duties and responsibilities to the plaintiffs and as officers of the Court to date. * * "

It is evident that Turner questioned the legality of appellees' employment by the state on the ground that the provisions of § 13.7, 1966 Iowa Code[1] were

1. This section in pertinent part provides:
"Special counsel. No compensation shall be allowed to any person for services as an attorney or counselor to any department of the state government, or the head thereof, or to any state board or commission, but the executive council may employ legal assistance, at a reasonable compensation, in any pending action or proceeding

not complied with when appellees were initially retained. Turner conveyed his views to the Executive Council of Iowa on January 10, 1966.[2]

The Council held a hearing on January 24, 1967, for the express purpose of delving into the controversy. Attending the meeting, in addition to members of the Council, were Turner, one of his assistants and the appellees. The proceedings were recorded and are a part of the record. At this hearing the attorney general, in response to an inquiry as to his position regarding the payment for services rendered by appellees, stated:

"I haven't said that the State of Iowa has no responsibility to you, [Lawyer and Hawkins] and in fact on a previous meeting here before the Council [apparently January 10 meeting] I suggested to the Council that if the State of Iowa takes advantage of work and information you have performed and obtained that the State of—that the law may well imply a contract whereby you would be entitled to recover on the quantum meruit for the value of your services today.

\* \* \* \* \* \*

\* \* \* "[I]n my opinion they [attorney general and state] would have an obligation to pay you on the quantum meruit for the value of services you have rendered to date."

Further, in another colloquy, Mr. Turner informed appellees, "my answer \* \* \* is that I think, yes, you were attorneys for the State and you did undertake as attorneys to represent the State of Iowa."

Following full exploration of the controversy, including evidence from appellees as to the nature of their services, the Executive Council, by letter of February 28, 1967, informed Mr. Hawkins:

"This letter will confirm action taken by the Iowa Executive Council January 24, 1967, with reference to legal services rendered by you for the case of State of Iowa et al. v. Union Asphalt and Roadoils, Inc. et al.

The Executive Council on that date determined that you had fully and completely discharged your duties and responsibilities to us on the above mentioned case and that you had furnished us with all of the information which you were able to provide under the circumstances of the case."

Subsequent to the hearing on January 24, the Executive Council on February 7 requested an opinion from the attorney general concerning the legality of paying appellees for their services, specifically, whether the Council under § 19.10 of the Iowa Code was authorized to pay appellees.[3]

The attorney general, in response to the request, furnished no opinion concerning the authority of the Council under § 19.10, but confined his discussion to § 13.7. He concluded his opinion by adhering to his former expressions stating:

"I believe the State has a moral obligation to compensate these lawyers on a quantum meruit basis for the fair and reasonable value of their services to the State and the benefit of any of which the State accepts, *but such compensation can only be authorized by the legislature.*" (Emphasis supplied.)

---

to protect the interests of the state, but only upon a sufficient showing, in writing, made by the attorney general, that his department cannot for reasons stated by him perform said service, which reasons and action of the council shall be entered upon its records."

2. Chapter 19 of the Iowa Code Ann. is the statutory authority for the creation of the Executive Council and the duties and authority conferred upon it. Section 19.1 provides that the Council shall con-

sist of the Governor, Secretary of State, Auditor of State, Treasurer of State, Secretary of Agriculture.

3. Section 19.10 provides: "The executive council may pay, out of any money in the state treasury not otherwise appropriated, any expense incurred, or costs taxed to the state, in any proceeding brought by or against any of the state departments or in which the state is a party or interested."

Thereafter, on February 27, the secretary of the Executive Council, acting pursuant to directions from the Council, forwarded a "complete file consisting of itemized statements received from Mr. Hawkins and Mr. Lawyer and the Attorney General's opinion" to the chairman of the Iowa State Senate Judiciary Committee for determination by the Committee.

On July 24, 1967, the Iowa General Assembly enacted Senate File 797, (Iowa Legislative Service, v. 4, 1967, at 791) Laws 1967, c. 75 which provides in substance as follows:

"Section 1. The employment of Lex Hawkins and Verne Lawyer as attorneys or special assistant attorney generals for the state of Iowa, representing the state of Iowa in regard to investigation and commencement of lawsuits against certain companies for alleged violation of the Sherman Anti-Trust Act in bidding and selling asphalt to the state of Iowa and its political subdivisions, from its inception to the termination of such representation on or about the tenth (10th) day of January, 1967, is hereby legalized, validated and confirmed."

Section 2 of the Act provides that awards to the attorneys shall be set and determined by a judge of "a court having jurisdiction over the subject matter thereof."

Proceeding with the chronology we find that on August 16 appellees filed an application in the United States district court for an allowance of attorney fees and expenses for the services rendered and expenses incurred in the litigation prior to their discharge on January 10. The court scheduled the motion for a hearing on September 7, 1967.

The attorney general filed a motion to stay proceedings on the application. He did not challenge the jurisdiction of the court but asserted that the action should be stayed for the reason that the attorney fees and expenses could be more accurately determined after the antitrust case had been concluded and alleged further that in the event of recovery by the plaintiffs the attorney fees in question could be taxed against the defendants.

The district court denied the motion to stay on September 7 and proceeded with the hearing. At the outset, the court sua sponte raised the question of its jurisdiction. During the colloquy Turner informed the court:

"I would like to say for the record that the State does not intend to raise the question of jurisdiction in this matter. * * * We do have doubts * * * as to whether this Court has jurisdiction, but * * * if it's at all possible we would like to aid the Court and will file briefs in an attempt to sustain the jurisdiction which I'm sure the Legislature wanted to confer upon the Court * * *."

The court then proceeded with the hearing and received evidence relating to the services rendered and expenses incurred by appellees.

On November 6, while the matter was under consideration by the court, appellees filed a motion pursuant to Rule 60 (b), F.R.Civ.P., requesting the court to amend its order of January 10, 1967, to provide that appellees be permitted to condition their withdrawal upon the payment of reasonable attorney fees. This motion was apparently designed to bring the case within the teachings of this court in First Iowa Hydro Elec. Coop. v. Iowa-Illinois Gas & Elec. Co., 245 F.2d 613 (8th Cir. 1957), where the district court conditioned its order of substitution of counsel upon a grant of attorney fees.

We observe preliminarily that the district court was vested with jurisdiction over the subject matter of the antitrust suit filed on December 6, 1966, out of which this controversy arose. Clayton Act § 4 (15 U.S.C. § 15). The question which initially concerned Judge Hanson related to the court's jurisdiction to adjudicate the fee controversy between appellees and their former client. The

court engaged in an exhaustive review of the doctrine of federal ancillary jurisdiction, and documented its discussion with authorities which it deemed analogous in principle. 281 F.Supp. at 396. In view of the comprehensive exposition of the law by the district court we shall confine our discussion to the primary purpose of the doctrine of ancillary jurisdiction. 1 Barron and Holtzoff, Federal Practice and Procedure, § 23 (Rules ed. 1960), often cited by the court, states:

> "One of the most useful devices for mitigating the otherwise strict limitations of federal jurisdiction is the concept of 'ancillary jurisdiction,' by which it is held that a district court acquires jurisdiction of a case or controversy as an entirety, and hence may, as an incident to disposition of a matter properly before it, possess jurisdiction to decide other matters raised by the case of which it could not take cognizance were they independently presented.

> "If the court has jurisdiction of the principal action, it also has cognizance of any ancillary proceeding therein, regardless of the citizenship of the parties, the amount in controversy or any other factor that would ordinarily determine jurisdiction.

> "Ancillary jurisdiction exists because without it the court could neither effectively dispose of the principal case nor do complete justice in the premises. It is a common-sense solution of the problems of piecemeal litigation which otherwise would arise by virtue of the limited jurisdiction of federal courts."

Forrester, Federal Jurisdiction and Procedure 294–95 (Dobie and Ladd, 2d ed., 1950) explains the theory and use of ancillary jurisdiction, as follows:

> "The definitive statements of most legal authorities appear to found the doctrine of ancillary jurisdiction on the basic principles of justice, necessity and efficiency. Ancillary juris-

diction exists because of the relation of the incidental proceeding to the principal case over which original jurisdiction already exists. This relation alone creates and establishes such ancillary jurisdiction."

See also Wright on Federal Courts, § 9, at 17 (1963); Fins, Federal Jurisdiction and Procedure 71–74 (1960); 21 C.J.S. Courts § 88 (1940).

There is case law which, in our view, lends support for the conclusion that the court had the power to resolve appellees' claim under its ancillary jurisdiction. In National Equipment Rental, Ltd. v. Mercury Typesetting Co., 323 F.2d 784 (2d Cir. 1963), Caddy, the attorney, represented one of the litigants from June 13, 1961, until his discharge on January 29, 1963, during which period an action was brought in the United States district court. After his discharge Caddy filed a motion in the pending district court case seeking the fixing of fees and disbursements due him from his former client. Judge Lumbard observed:

> "The law seems well settled that a federal district court may condition the substitution of attorneys in litigation pending before it upon the client's either paying the attorney or posting security for the attorney's reasonable fees and disbursements, as these may be determined. [Citing cases] This power resides in the federal court as ancillary to its conduct of the litigation." *Id.* at 786.

In a footnote Judge Lumbard stated:

> "The termination of relations between a party in litigation in a federal court and his attorney is a matter relating to the protection of the court's own officers and is not subject to the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188." *Id.*

See also First Iowa Hydro Elec. Coop. v. Iowa-Illinois Gas & Elec. Co., *supra.*

Here, of course, the order of January 10, 1967, permitting appellees to withdraw was not conditioned upon the

**1244**

state of Iowa paying the attorneys or posting security. We do not believe the failure to enter a conditional order deprived the court of authority to entertain a subsequent motion by appellees and to grant such relief as was required to do full and complete justice. In our view, the order, interlocutory in nature as it was, did not have the legal effect of destroying jurisdiction which existed by force of law.

We are satisfied that on this record power resided in the district court to adjudicate the disagreement between appellees and the attorney general of Iowa as ancillary to its jurisdiction over the principal action. As Judge Hanson's opinion discloses, he also concluded that he had the authority under Rule 60(b), F.R.Civ.P., or under his inherent power to grant appellees relief. In view of our holding we find it unecessary to consider or discuss these alternative theories.

Appellants also submit that the district court was barred from granting relief to appellees because of the Eleventh Amendment of the United States Constitution which, as interpreted, denies to a federal court authority to entertain a suit against a state by a citizen thereof in the absence of a proper consent or waiver. This claimed infirmity was not relied upon by the attorney general in the district court.

 In our view, this argument must rest upon the premise that the motion of appellees for allowance of fees constituted an independent action against the state of Iowa within the meaning of the Eleventh Amendment. Our holding that the claim in issue was incident to the primary action and therefore within the ancillary jurisdiction of the court is dispositive of the Eleventh Amendment argument. Beyond doubt the district court had jurisdiction of the subject matter and of the parties plaintiff and defendant in the antitrust case. 15 U.S.C. § 15. Having voluntarily invoked the jurisdiction of the federal court the state must submit to any valid order or judgment within the authority of the court to enter.[4]

The final two contentions are directed at the amount awarded appellees. The record indicates that from the outset of the disagreement, which erupted in the early part of January, 1967, the attorney general was adamant in his view that the services rendered by appellees were of little or no value to the state in the antitrust action. The argument was pressed in the district court and is renewed here. Additionally, it is asserted that there is no proof that the fees allowed were fair and reasonable.

The district court's resume of the law and the evidence, and its ultimate findings, demonstrate that it fully comprehended and applied the correct criteria for determining compensation of attorneys on a quantum meruit basis. 281 F.Supp. at 399–400. We fully concur in Judge Hanson's analysis of the law. We also conclude that there is substantial evidence to support the court's determination of the amount due appellees.

The judgment is affirmed.

4. People of Porto Rico v. Ramos, 232 U.S. 627, 34 S.Ct. 461, 58 L.Ed. 763 (1914); Clark v. Barnard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883); Rank v. United States, 142 F.Supp. 1, 67 (S.D. Cal.1956), stand for the proposition that when a state voluntarily comes into a court which has jurisdiction of the subject matter, it waives its sovereign immunity and submits itself to the court's jurisdiction.