[No. 54084–5.   En Banc.   March 24, 1988.]

WASHINGTON IRRIGATION AND DEVELOPMENT COMPANY, *Plaintiff,* v. THE UNITED STATES OF AMERICA, *Appellant,* RAINIER NATIONAL BANK, *Respondent.*

*Roger M. Olsen, Assistant Attorney General of the United States,* and *Michael L. Paup, William S. Estabrook, Lisa A. Prager, Anastasia K. Dritshulas,* and *Steven W. Parks (Gene S. Anderson, United States Attorney,* of counsel), for appellant.

*Weinrich, Gilmore & Adolph, P.S.,* by *Robert J. Adolph* and *Jennifer M. Coughlin,* for respondent.

DURHAM, J.—The Washington Irrigation & Development Company (WIDCO) initiated this interpleader action in Lewis County in 1983 to determine to whom it should pay a

debt it owed to J. C. O'Connor Construction, Inc. Claims to the debt had been asserted by the United States Internal Revenue Service and Rainier National Bank. The IRS and Rainier tried the action to the court and both parties now challenge the trial court's order disbursing the interpleaded funds. We affirm in part and reverse in part.

## I
### FACTS

In October 1980, O'Connor entered into a financing arrangement with Rainier. Under the arrangement, O'Connor presented to Rainier invoices for sums owed O'Connor by its customers. Rainier paid O'Connor 80 percent of the face value of the invoices. The receivables were then paid directly to Rainier to repay the invoice financing as well as other loans Rainier had made to O'Connor. Rainier secured the invoice financing arrangement against O'Connor's present and after-acquired receivables, contract rights, and inventory.

The IRS first acquired a lien on O'Connor's assets in March 1981, when it served on Rainier notices of federal tax liens for O'Connor's unpaid taxes for December 1980 through February 1981. On June 29, 1981, the IRS, Rainier and O'Connor met and worked out a repayment plan for O'Connor's tax debts. The plan, set forth in a written installment agreement executed by the IRS and O'Connor, called for O'Connor to pay the IRS each month from July through December 1981, the greater of 10 percent of its gross receivables or $10,000 to cover past-due taxes, and to pay current payroll taxes within 2 days of each payroll date. Rainier agreed to transmit to the IRS the payments on back taxes from its collections of O'Connor's receivables. The bank also agreed to continue to advance O'Connor working capital so that it could stay in business. The IRS, for its part, agreed not to levy on any of O'Connor's new receivables.

Rainier sent the IRS $89,425.51 between June 29 and December 31, 1981 and continued to finance O'Connor's

operations. The IRS and O'Connor amended the install-
ment agreement in December 1981, reducing O'Connor's
minimum monthly payment to $5,000. Accordingly, Rainier
sent the IRS $15,000 during the first 3 months of 1982.

In December 1981, O'Connor breached the installment
agreement by failing to keep current on its payroll taxes. At
the IRS's request, O'Connor authorized the IRS to apply
the payments forwarded by Rainier to current taxes instead
of to the 1980–81 past–due taxes. Rainier was not notified
of O'Connor's breach, or of the change in application of the
payments, and continued to send the IRS payments from
O'Connor's paid–in invoices. As a result, these payments
went to satisfy liabilities for current taxes with respect to
which Rainier's security interests would have priority over
an IRS tax lien, leaving unpaid the past–due tax liabilities
that gave the IRS priority.

In March 1983, O'Connor contracted to sell $500,000
worth of crushed rock to WIDCO. The IRS on June 7, 1983,
served a notice of levy on WIDCO demanding $142,000 to
satisfy O'Connor's indebtedness for taxes due in the fourth
quarter of 1980, and the first, second and fourth quarters of
1982. The IRS previously had filed liens to secure payments
of taxes due in these periods. On the same date, the IRS
served a similar notice of levy on Rainier. Rainier sent the
IRS agent who served the notice of levy to O'Connor's
nearby offices, and 2 days later O'Connor paid the IRS
$21,702.55 from its accounts at Rainier.

Facing conflicting demands from the IRS and Rainier to
the money it owed O'Connor, WIDCO initiated the present
interpleader action on June 27, 1983, by depositing with the
court the $101,632.99 it then owed O'Connor. Subsequently,
in September 1983, WIDCO deposited an additional
$141,922.19, reflecting further sums it owed O'Connor. In
1985, however, the trial court awarded to Rainier the excess
in the interpleaded fund over the $142,578.46 demanded by
the IRS in its notice of levy.

On May 2, 1986, the trial court entered findings of fact
and conclusions of law. The trial court determined that the

IRS's tax liens for the fourth quarter of 1980 and the first and second quarters of 1982 primed Rainier's security interests, but that Rainier's interests primed the IRS's lien for the fourth quarter of 1982. On May 30, 1986, the court ordered the disbursement of the remaining interpleaded funds, awarding $64,222.99 to the IRS and $78,802.78 to Rainier. The IRS's award included statutory interest accruing from the date of its notice of levy on WIDCO to the date WIDCO filed the interpleader suit.

Both the IRS and Rainier appeal from this order. The parties do not dispute the trial court's determination of lien priorities. Rather, they challenge the manner in which the priority amounts were calculated.

## II
### THE IRS APPEAL

The IRS makes two assignments of error. First, it alleges error in the trial court's failure to include in the IRS's award statutory interest on O'Connor's tax liabilities accruing during the pendency of the interpleader action. Second, it asserts that the trial court erred in excluding evidence relating to O'Connor's tax liabilities for the third quarter of 1980. We affirm the trial court on the first issue, but reverse on the second.

### Accrual of Interest

The IRS argues that the federal tax lien laws expressly include in the lien amount interest accrued on taxes past due, without limitations relating to the pendency of judicial proceedings. Rainier asserts that the laws do not authorize recovery of interest accrued during interpleader proceedings, and that equitable principles support the trial court's decision denying the IRS interest accruing during this action.

Section 6321 of the Internal Revenue Code, 26 U.S.C. § 6321 (1982), gives the United States a lien on the property of tax defaulters, in the amount of the tax plus interest, penalties and other additions and costs. Section 6601(a) provides that interest on defaulted tax liabilities "shall be

paid for the period from [the date the taxes were due] to the date paid." 26 U.S.C. § 6601(a) (1982).

Against this seemingly straightforward statutory priority, Rainier argues that "in bankruptcy and other insolvency proceedings interest upon claims ceases to accrue at the initiation of the proceedings." *In re Boston & Maine Corp.,* 719 F.2d 493, 495 (1st Cir. 1983), *cert. denied,* 466 U.S. 938 (1984). This rule is properly applied in this case, Rainier argues, to prevent the inequity that would result if the IRS assessed the interest for past–due taxes against other creditors of the defaulted taxpayer who are not to blame for that default.

The IRS argues that this rule is applicable only in bankruptcy and insolvency proceedings, and that because this case "involves neither a bankrupt nor an insolvent", the rule cannot be applied here. In support of this distinction, the IRS cites *Zontelli & Sons, Inc. v. Fabyanske, Svoboda & Westra, P.A.,* 394 N.W.2d 526 (Minn. Ct. App. 1986). On facts closely similar to those at issue here (an interpleaded fund subject to competing claims from the IRS and other creditors), the Minnesota Court of Appeals reversed a trial court judgment denying the IRS statutory interest on taxes owed, finding that the equitable principle Rainier asserts in this action has limited applicability to bankruptcy proceedings and cannot override the "explicit and controlling statutory provisions" of the Internal Revenue Code that establish the IRS's right to receive interest. *Zontelli,* at 530.

■■ We are not persuaded by the reasoning in *Zontelli,* however. It is well established, not only in bankruptcy and insolvency but in other contexts as well, that interest is not charged against the party owing a debt when the funds owed are in *custodia legis. See Wilson v. Wilson,* 35 Wn.2d 364, 369, 212 P.2d 1022 (1949); *Bank of China v. Wells Fargo Bank & Union Trust Co.,* 209 F.2d 467, 475–76 (9th Cir. 1953) (action "akin to . . . interpleader"); *Shell Oil Co. v. Jones,* 191 F. Supp. 585, 590–91 (S.D. Tex. 1960) (interpleader action). This rule applies not only to protect debtors from seeing their debts inflated by interest accrual

while the litigative process slowly reaches its conclusion, but also, when the funds held by the court are claimed by competing creditors, to prevent claims carrying a low rate of interest from being overridden by claims that happen to bear a high interest rate. *See American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266, 58 L. Ed. 949, 34 S. Ct. 502 (1914).

In this case, to allow the IRS to recover from the interpleaded funds statutory interest accruing during the pendency of this litigation would substantially prejudice Rainier. The IRS's interest apparently would eat up most, if not all, of the interpleaded funds. By itself, this would not be enough to warrant invoking equity in Rainier's favor; Rainier cannot seek the protection of equity from a result that is merely unpleasant. We note, however, that Rainier litigated this action on the reasonable belief that it had no other recourse to collect the monies O'Connor owed. Shortly after this suit was filed, O'Connor petitioned for bankruptcy. The bankruptcy petition was dismissed 1 year before trial in this action, but over 1½ years after this action commenced.

The IRS argued to the court below that, at any time during the interpleader proceedings, Rainier could have stipulated to pay the IRS's claims and, thus, stopped the accrual of interest. Rainier reasonably believed that O'Connor was insolvent, however, and thus should not be prejudiced for litigating this case on that belief.[1]

---

[1]Denying the IRS the interest it seeks, it should be noted, does no harm to its ability to recover the interest from O'Connor, the taxpayer whose ultimate responsibility it is to compensate the IRS for the tardiness of its tax payments. *See Bruning v. United States*, 376 U.S. 358, 11 L. Ed. 2d 772, 84 S. Ct. 906 (1964). To the extent the IRS has difficulties recovering the statutory interest from O'Connor, it may have only itself to blame. The IRS might have collected immediately the tax liabilities described in the levy it served on WIDCO had it simply enforced the levy. WIDCO's decision to initiate this interpleader action should have been no bar to such enforcement; that a person served with a levy might face competing claims to the property levied upon does not relieve that person of liability under 26 U.S.C. § 6332(c) (1982) for failure to comply with the levy. *United States v. National Bank of Commerce*, 472 U.S. 713, 726–33, 86 L. Ed. 2d 565, 105 S. Ct. 2919 (1985).

We also disagree with the *Zontelli* court that the federal tax lien laws are "explicit and controlling statutory provisions" of the sort "[a] court of equity cannot disregard." *Zontelli,* at 530 (quoting *In re Fulghum Constr. Corp.,* 706 F.2d 171, 173 (6th Cir. 1983)). Because we find nothing in the federal tax lien provisions of the Internal Revenue Code explicitly authorizing the accrual of interest during the pendency of judicial proceedings such as this one, *cf. In re Pavone Textile Corp.,* 302 N.Y. 206, 212–13, 97 N.E.2d 755 (1951), *aff'd,* 342 U.S. 912 (1952) (exploring question of whether statute including accrued interest in amount of lien "expressly" provides for accrual during pendency of judicial proceeding), we hold that the equitable rule disallowing interest while funds are in the custody of a court supports the trial court's decision in this case. Though the requirement in 26 U.S.C. § 6601(a) (1982) that interest on past–due taxes shall accrue to the date the taxes are paid may trump some principles of equity, *see Johnson v. United States,* 602 F.2d 734, 738–39 (6th Cir. 1979), we do not find it sufficiently explicit to override the equitable rule set out above preventing the accrual of interest during this interpleader action. Nor apparently do other courts which have applied this rule of equity against federal tax liens. *See In re Kerber Packing Co.,* 276 F.2d 245 (7th Cir. 1960), and cases cited therein.

*United States v. Augspurger,* 508 F. Supp. 327 (W.D. N.Y. 1981), on which the IRS relies, is not to the contrary. In *Augspurger,* an investment company was assessed a penalty for its failure to comply with an IRS levy. The company sought to avoid paying interest on the penalty on the ground that it earlier had paid funds into the court. The court held the company liable for the accrued interest.

We are not relieving O'Connor of liability for the interest that accrued on its tax debts during this litigation. We simply are denying the IRS an award of that interest from the funds interpleaded in this action, in recognition of the prejudice such an award would cause to Rainier. Our holding is not inconsistent with *Augspurger*; as in that case, the

IRS's debtor (O'Connor) remains liable for interest on its obligations "to the date paid." 26 U.S.C. § 6601(a) (1982).

The trial court's decision to exclude from the IRS's award statutory interest accruing during the pendency of this proceeding is affirmed.

### Third Quarter 1980 Tax Liabilities

The trial court prohibited the IRS from putting forth evidence of O'Connor's tax liabilities for the third quarter of 1980 apparently because the notice of levy the IRS served on WIDCO did not list any tax liabilities for that period. Discussing its ruling at trial, the trial court said: "[T]he four liens that were the subject of the levy would appear also to be the proper subjects for purposes of this trial." The trial court also wrote in its finding of fact 16 that the levy "controls the IRS's claim in this case . . ."[2]

■ The exclusion of this evidence was error. RCW 4.08-.180 provides that in interpleader actions "[e]ither of the defendants may set up or show any claim or lien he may have" to the interpleaded property. By its plain language, this provision allows the IRS to assert its right to the interpleaded fund arising from O'Connor's third quarter 1980 tax liabilities, notwithstanding that the notice of levy did not disclose this basis for its claim to the fund.

The trial court should have distinguished the question of how much money WIDCO could properly interplead from that of what claims could be brought against the interpleaded fund. Having determined in a summary judgment order that the interpleaded fund should comprise only the amount stated in the notice of levy,[3] the trial court felt that the notice of levy should control the bases for the IRS's claims to the fund as well.

---

[2]Additionally, the court before trial granted Rainier's motion for partial summary judgment, awarding to Rainier the amount of the interpleaded fund in excess of the amount stated in the notice of levy to WIDCO.

[3]The IRS did not appeal this ruling, so the correctness of this determination is not at issue.

Interpleader does not work that way, however. An interpleader action proceeds in two stages: (1) determining the propriety of interpleading adverse claimants to a fund held by a disinterested stakeholder, and discharging the stakeholder; and (2) equitably dispensing the fund among the claimants. *See* 7 C. Wright, A. Miller & M. Kane, *Federal Practice* §§ 1704, 1714 (1986); *Federal Old Line Ins. Co. v. McClintick,* 18 Wn. App. 510, 513, 569 P.2d 1206 (1977). The complaint in interpleader filed by the stakeholder, setting forth its request to be discharged from liability in connection with a fund subject to adverse claims, is relevant only to the first stage of the proceeding. The nature of claims against the fund—determined in the proceeding's second stage—is controlled by the answers filed by the claimants. *See* 48 C.J.S. *Interpleader* § 40 (1981).

In this proceeding, WIDCO established the propriety of interpleader by pleading that it had received the notice of levy from the IRS and claims from Rainier, setting forth as exhibits to the complaint the notice of levy and Rainier's security agreement with O'Connor, and asserting that both the IRS and Rainier had claimed priority of interest. WIDCO was not required to limit the interpleaded fund to the amount of the IRS's levy, however.

> Our statutes relating to interpleader do not require that, before an action can be maintained, plaintiff shall allege that he has been sued or suit threatened, or that he is in danger of having judgment rendered against him twice for the same property.

*State Bank v. Wilbur Mission Church,* 44 Wn.2d 80, 89, 265 P.2d 821 (1954). "Any allegation which shows the fact that each of two different parties claims the property is sufficient." *Daulton v. Stuart,* 30 Wash. 562, 566, 70 P. 1096 (1902).

It would have been sufficient, therefore, for WIDCO to have based its complaint in interpleader on the IRS's tax lien filings and Rainier's filing of its financing statement, even if these were not served on WIDCO. In that circumstance, the interpleaded fund would amount to the sum of

all of the IRS's tax liens, not just those liens described in the notice of levy actually served on WIDCO. To limit the claims the IRS may assert against the interpleaded fund to those listed in the notice of levy merely because of the way WIDCO drafted its complaint in interpleader, unreasonably restricts the IRS's ability to assert "any claim or lien [it] may have". RCW 4.08.180.

Because evidence of O'Connor's tax liabilities for the third quarter of 1980 was improperly excluded, we remand for a recalculation of the awards from the interpleaded funds in light of evidence of these liabilities.

### III
### THE RAINIER APPEAL

Rainier makes two assignments of error. First, Rainier argues that the trial court should have reduced the amount of the IRS's first–quarter 1982 lien priority because the IRS had breached the repayment agreement Rainier had worked out with O'Connor and the IRS in June 1981. Alternatively, Rainier claims that this lien priority should be reduced because the IRS was unjustly enriched when it applied payments Rainier sent it during the first quarter of 1982 to current tax liabilities instead of to past tax liabilities, contrary to Rainier's understanding as to the purpose of the payments. Second, Rainier contends that the trial court should have reduced the IRS's award by the amount O'Connor paid the IRS in June 1982 after the IRS had served a notice of levy on O'Connor's accounts at Rainier. We affirm the trial court on the first issue, but reverse on the second.

### First Quarter 1982 Lien Priority Amount

Rainier argues that under the June 29, 1981 tax repayment plan the IRS agreed to subordinate its lien priorities to Rainier's. For its part, Rainier agreed to continue to advance working capital to O'Connor and to forward to the IRS O'Connor's monthly tax payments from O'Connor's paid–in invoices. Rainier asserts that in December 1981,

when O'Connor authorized the IRS to apply these payments to current taxes without informing Rainier of the change, the IRS was in breach of the repayment agreement. Rainier argues that because of the IRS's breach, the IRS's lien for the first quarter of 1982—the period during which Rainier continued to make O'Connor's payments, thinking they were for back taxes instead of current taxes—should not be given priority over Rainier's interest.

The trial court determined that the IRS, Rainier and O'Connor met on June 29, 1981, and devised a means for O'Connor to pay its back tax liabilities. The findings of fact suggest that the parties reached a 3–way agreement. Conclusion of law 5, however, states: "The agreement which was reached at the June 29, 1981 meeting was not an enforceable contract between the IRS and Rainier." This conclusion appears to be supported by substantial evidence in the record. The only written memorials of any agreements are the two installment agreements O'Connor and the IRS executed, the first requiring O'Connor to pay the greater of $10,000 or 10 percent of its gross receivables each month in order to satisfy liabilities for $85,000 in taxes due from December 1980 through February 1981, and the second reducing the minimum payment to $5,000. There is no written agreement between the IRS and Rainier.

While Rainier may have desired that the IRS obligate itself under the plan, the IRS persistently declined to enter into a binding contract with Rainier. The Rainier credit officer in charge of "working out" O'Connor's loan repayment difficulties stated at trial that the IRS was not willing to enter into a written agreement, as sought by Rainier, subordinating the IRS's liens to Rainier's. The revenue agent in charge of collecting O'Connor's taxes, Helen DeLaune, also testified that she never agreed to subordinate the IRS's liens to Rainier's, and that "my agreement was with Mr. O'Connor". Ms. DeLaune acknowledged that the payment plan would be unworkable without Rainier's cooperation, because without Rainier's financing, O'Connor would not be able to generate new receivables to pay its

tax liabilities. She said also, however, that the IRS was willing to let O'Connor go out of business rather than buy Rainier's cooperation by agreeing to subordinate its liens to Rainier's.

Rainier's complaint seems to be merely that its cooperation in the payment plan did not benefit it in the way it had hoped. Rainier had as much of an interest in O'Connor's vitality as the IRS; the bank looked to O'Connor's receivables for repayment of its loans as the IRS looked to them for repayment of the past–due taxes. Thus, Rainier is disingenuous to assert that its decision to continue financing O'Connor's operations is evidence that the IRS had bound itself under the plan in return. Rainier's desire for an enforceable promise from the IRS does not establish the existence of the promise. *See Everett v. Estate of Sumstad,* 95 Wn.2d 853, 855, 631 P.2d 366 (1981) (objective manifestation theory of contracts). Thus, we affirm the trial court's finding that the IRS had no obligations to Rainier under the June 29, 1981 repayment arrangement.

Rainier argues in the alternative that it should be awarded the money it sent to the IRS during the first quarter of 1982 in accordance with the June 29, 1981 repayment plan because it sent that money only on the understanding that the money would be used to pay O'Connor's back taxes. When the IRS applied the payments to current taxes instead, Rainier argues, the IRS was unjustly enriched.

██ Even if the way the IRS applied the funds in question somehow unduly benefited it, Rainier's unjust enrichment claim fails because Rainier has not shown that it was damaged by anything the IRS did. Rainier claims detriment in that it let go of money it might have used to recover loans previously advanced to O'Connor. The IRS persuasively refutes Rainier's assertions, however. It contends that had it applied the payments to back taxes, instead of current taxes, it "would simply have had a larger tax lien for first quarter 1982 taxes at the time of trial, and

that tax lien would still have been superior to any claim asserted by Rainier."

Rainier's reply—that it would have ceased loaning money to O'Connor had it known about the change in application of the payments it forwarded to the IRS—still does not show any detriment. Even if Rainier had discontinued financing O'Connor's operations, that would not have affected the flow of payments to O'Connor for work previously performed. These payments still would have had to go to the IRS to satisfy its earlier liens. If Rainier had collected the payments but failed to forward them, the IRS clearly would have a right to bring a lien foreclosure suit to recover them to the extent the IRS's liens remained unsatisfied. *See United States v. Bank of Celina,* 721 F.2d 163 (6th Cir. 1983) (IRS may recover in lien foreclosure taxpayer's funds that bank already had set off against taxpayer's debt to bank).

As the record discloses, O'Connor's 1980–81 tax liabilities totaled $134,000. Rainier paid approximately $104,000 of this under the tax repayment plan devised on June 29, 1981, including $15,000 during the first quarter of 1982. Thus, the IRS's liens on the original $134,000, notices of which it served on Rainier in March 1981 and the priorities of which are not challenged here, remained unsatisfied even after Rainier forwarded payments during the first quarter of 1982. Rainier could not, therefore, have kept these payments to satisfy its own loans to O'Connor.

Because Rainier was not damaged by anything the IRS did, its unjust enrichment argument must be rejected. *See Bill v. Gattavara,* 34 Wn.2d 645, 209 P.2d 457 (1949).

## Payment Following Levy

On June 7, 1983, the IRS served on Rainier's Centralia branch a copy of the notice of levy it also that day served on WIDCO. Instead of surrendering the funds it had in O'Connor's accounts, Rainier sent the IRS agent who served the levy to O'Connor's offices, one–half block away. On June 9, O'Connor closed its accounts at Rainier, paying

the proceeds to the IRS. The trial court held that, because O'Connor instead of Rainier paid over to the IRS the money levied upon, the money was not recovered as "proceeds" of the levy, and thus did not have to be applied to the tax liabilities described in the levy (*i.e.*, liabilities for fourth quarter 1980, and first, second and fourth quarter 1982 taxes). The court thus permitted the IRS to apply this money ($21,702.55) to current taxes instead, leaving unpaid the earlier tax liabilities listed in the levy in the amount of which the IRS's liens were prior to Rainier's security interests. Rainier challenges this holding, and seeks to reduce the IRS's award by the amount O'Connor paid the IRS after the levy was served. We reverse the trial court.

Section 6342 of the Internal Revenue Code provides:

> Any money realized by proceedings under this subchapter (whether by seizure, by surrender under section 6332 (except pursuant to subsection (c)(2) thereof), or by sale of seized property) . . . shall be applied . . .
>
> . . .
> . . . against the liability in respect of which the levy was made . . .

26 U.S.C. § 6342(a)(3) (1982). Section 6332(a) requires that "any person in possession of . . . property . . . upon which a levy has been made shall, upon demand of the Secretary, surrender such property . . ." 26 U.S.C. § 6332(a) (1982). Failure or refusal to surrender subjects one to liability for the value of the property levied upon, and to a penalty if the failure or refusal is without reasonable cause. 26 U.S.C. § 6332(c) (1982).

The IRS argues that it is not restricted by section 6342 because Rainier never "surrendered" the levied–upon funds to the IRS, but allowed O'Connor to pay over these funds. The IRS moreover characterizes O'Connor's payment as undertaken "in the normal course of business", apparently suggesting that this payment was not a "surrender".

The trial court expressly found, however, that O'Connor paid the IRS the $21,702.55 "to partially satisfy the levy." It also described the payment as "a result of the IRS levy."

While a payment made by a taxpayer to the IRS prior to the time a levy is served may not be sufficiently involuntary to constitute a "surrender", *see Interfirst Bank Dallas, N.A. v. United States,* 769 F.2d 299, 304–06 (5th Cir. 1985), *cert. denied,* 475 U.S. 1081 (1986), a payment made only because of a levy is undeniably a "giv[ing] . . . up . . . upon compulsion or demand". *Webster's Third New International Dictionary* 2301 (1981). O'Connor's chief executive testified that he paid the IRS the $21,702.55 in O'Connor's accounts at Rainier's Centralia branch because "[t]he levy was there. It had been issued. You know, the money was basically frozen and I think Rainier had to give an answer." The trial court thus properly viewed O'Connor's payment as a result of the levy, but erred in approving the IRS's application of these payments to current taxes instead of to the tax liabilities "in respect of which the levy was made", as required by 26 U.S.C. § 6342(a)(3) (1982). On remand, the court therefore should treat the $21,702.55 as having been applied against the tax liabilities described in the levy and readjust the parties' awards accordingly.

## IV
### CONCLUSION

The case is remanded for a redetermination of the parties' awards. The trial court on remand should take into account evidence of O'Connor's tax liabilities for the third quarter of 1980, and reduce the IRS's award to compensate for its improper application of the money it received from O'Connor after the levy was served on Rainier. In all other respects, the trial court's order is affirmed.

PEARSON, C.J., UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, and CALLOW, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (concurring in part, dissenting in part)—I concur in the majority, however, I would reverse the trial court's denial of interest to the Internal Revenue Service.

In affirming it, the majority violates the long–standing rule that a court's powers of equity do not permit it to disregard statutory directives.

The Internal Revenue Code expressly provides that: "If any amount of tax imposed by this title . . . is not paid . . . interest on such amount at an annual rate established under section 6621 shall be paid . . ." 26 U.S.C. § 6601(a) (1982). A long line of cases establishes that this requirement cannot be waived by a court in the exercise of its general equity powers. *In re Fulghum Constr. Corp.,* 706 F.2d 171, 173 (6th Cir. 1983); *Johnson v. United States,* 602 F.2d 734 (6th Cir. 1979); *United States v. Los Angeles Soap Co.,* 153 F.2d 320 (9th Cir. 1946); *Cibelli v. United States,* 585 F. Supp. 799, 800 (D. Conn. 1984); *United States v. Augspurger,* 508 F. Supp. 327 (W.D.N.Y. 1981). This rule applies here, and the IRS was entitled to interest on the tax money interpleaded.

The rule of *Fulghum* is merely an instance of the general rule that a court may not employ its equitable powers in order to override the command of a statute. To permit such an exercise would be to give the courts unwarranted power over the political branches of government and would invite extreme judicial activism. This has long been recognized.

> Accordingly, where any penalty or forfeiture is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred, for it would be in contravention of the direct expression of the legislative will. . . .
>
> . . .
>
> In *Powell* v. *Redfield,* 4 Blatchford, 45, an application was made in equity to restrain suits upon a bond given in pursuance of the revenue laws of the United States, which was denied on the ground that *a court of equity had no right to interfere and, by injunction or decree, to virtually repeal the express provisions of a positive statute, or defeat their operation in the particular case.*

(Italics mine.) *Clark v. Barnard,* 108 U.S. 436, 457, 27 L. Ed. 780, 2 S. Ct. 878 (1883). The fact that the interest due

here is not a penalty or forfeiture does not remove this case from *Clark*'s logic. The trial court here has exercised its equitable powers "in contravention of the direct expression of the legislative will." That cannot be condoned.

I would therefore reverse the trial court with regard to awarding interest to the IRS out of the interpleaded fund. With respect to the other issues, I am in agreement with the majority.

After modification, further reconsideration denied June 30, 1988.