**WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff,**

v.

**CITY OF BROOKSVILLE, Defendant.**

Case No. 8:09–cv–62–T–23TBM.

United States District Court,
M.D. Florida,
Tampa Division.

July 30, 2010.

Eugene E. Stearns, Mona Markus, Michael Joseph Thomas, John Nicholas Muratides, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, PA, Tampa, FL, for Plaintiff.

Jennifer Rey, The Hogan Law Firm, Brooksville, FL, for Defendant.

### ORDER

STEVEN D. MERRYDAY, District Judge.

This dispute arises from the City of Brooksville's (the "City") attempt to recover $5.3 million from Westchester Fire Insurance Company ("Westchester") ostensibly to install infrastructure for an abandoned, single-family housing development in Brooksville, Florida. Pursuant to 28 U.S.C. § 2201, Westchester seeks a declaration of the parties' rights and obligations under two performance bonds that require Westchester to indemnify the City from damage arising from a developer's failing to build infrastructure for the abandoned development. The City counterclaims to collect the face value of the bonds. Westchester moves for sanctions (Doc. 44) and for summary judgment (Doc. 49), and the City opposes (Docs. 52, 59) each motion. The City moves (Doc. 51) for summary judgment, and Westchester responds (Doc. 58) in opposition. At a July 22, 2010, hearing, the parties presented argument on the motions for summary judgment.

### Background

In 2005, Levitt and Sons of Hernando County ("Levitt") purchased property in southern Brooksville and planned to develop "Cascades of Southern Hills" ("the Cascades"), a five-phase residential housing project. In December, 2005, Levitt and the City executed a Utility Services Agreement (Doc. 45–2) in which the City agrees to provide potable water and sewer service to the Cascades. The "Development Schedule" (Doc. 45–2 at 18) provides that Levitt will complete Phase One, which comprises 191 lots, by March, 2006, and that Levitt will complete Phase Two, which comprises 169 lots, by June, 2006. The Agreement provides:

> The terms and provisions of the AGREEMENT shall be a commitment and obligation which shall not only bind the CITY and the present DEVELOPER of said described real property, but shall be a covenant which shall run with the land and shall bind and be enforce-

able against the heirs, successors and assigns of the DEVELOPER.

(Doc. 45–2 at 5) Levitt began to develop Phase One and recorded the final plat for Phase One in November, 2005. The development of Phase One presents no issue in this action.

On January 23, 2006, the City approved Phase Two's final plat. Recorded on March 31, 2006, the plat (Doc. 45–17) requires Levitt to construct several on-site improvements, including earthwork, roadways, storm lines, potable water lines, reclaimed water lines, and sanitary sewer lines (the "Phase Two Improvements"). Except for a water line running through the entire development, the Phase Two Improvements benefit only the lots in Phase Two, and the plat contemplates private roads accessible only to residents of the Cascades.

"[T]o ensure that future owners [will] be able to connect their lots to the City's utility services," (Doc. 45–6 at 3), Section 129–3(c) of Chapter 29 of the City of Brooksville Code of Ordinances provides:

(1) Before consideration of a final plat of a subdivision, the commission shall be satisfied that all improvements proposed and approved have been constructed.

(2) In lieu of completion of the improvements, a bond executed by a surety company, based on an estimate approved by the commission shall be furnished by the subdivider in an equal amount to the cost of construction of such improvements. The surety shall be subject to the condition that the improvements will be completed within 12 months after approval of the final plat and if they are not completed, the city shall proceed with the work and hold the owner and the bonding company jointly responsible for the costs thereof. . . .

(Doc. 30–4 at 5)

In accord with the City's ordinance, Levitt commissioned Coastal Engineering to estimate the construction cost of the Phase Two Improvements. Coastal Engineering estimated (Doc. 45–20) that the City would pay (1) $1,687,890.40 to construct the Phase Two storm water, potable water, reclaimed water, and sanitary sewer lines and (2) $2,605,354.40 for "general conditions" and "roadway/earthwork." Coastal Engineering increased the estimated cost by twenty-five percent to protect the City if the construction cost exceeds the engineer's estimate. Relying on the engineer's estimate, Levitt requested Westchester to issue two performance bonds on behalf of Levitt and in favor the City. The bonds (Doc. 45–16) state that the "estimated completion date" for Phase Two is February 23, 2007, and that Levitt and Westchester "bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally." The bonds provide:

the Developer has agreed to complete certain on-site and/or off-site Improvements in accordance with the Project Engineer's Certified Cost Estimate for Complete of Improvements . . . such that if the Developer promptly and faithfully completes the improvements as required by the City Approvals on or before the Estimated Date of Completion, then this obligation will be null and void; otherwise it will remain in full force and effect, subject only to the following conditions:

1. Partial releases of the aggregate dollar amount of this bond may be permitted upon proof of completion of improvements and written approval for release from the City.

2. If the Developer fails to complete the required improvements in accordance with the City Approvals, applicable regulations and this agreement, the Surety must, upon written demand by the City, promptly pay over to the City the unreleased portion of the bond so

that the City, or its agent, can complete the unfinished improvements in accordance with the terms and conditions of the City Approvals....

3. No right of action will accrue on this bond to or for the use of any person or corporation other than the City.

4. The Surety waives prior notice of any alteration or extension of time for completion of the Improvements that may be permitted or made by the City.

One bond (Doc. 45–16 at 2) for $2,109,761.75 covers the City's estimated cost to construct the water and sewer lines for Phase Two. The second bond (Doc. 45–16 at 7) for $3,256,693.00 covers the City's estimated cost for the "general conditions," roadways, and earthwork for Phase Two. On February 23, 2007, Westchester executed a "continuation certificate" extending the term (and presumably the estimated completion date) of each bond to February 23, 2008. (Doc. 45–16 at 5)

On November 9, 2007, before beginning construction of Phase Two, Levitt petitioned for bankruptcy. Although Levitt removed trees and cleared some of the land for Phase Two, Levitt neither began constructing the Phase Two Improvements, nor built a home on any lot in Phase Two, nor marketed or sold any lot in Phase Two. On November 29, 2007, the bankruptcy court granted Levitt's motion to abandon the Cascades. On December 13, 2007, the City demanded payment on the bonds. On February 22, 2008, the City sued Westchester in state court to foreclose the bonds. In March, 2008, the City and Westchester executed a "Forbearance Agreement," pursuant to which the City voluntarily dismissed the action without prejudice and agreed to:

> forbear from bringing further suit or suits against any or all of the Bonds, Surety, Developer, and/or any subsidiaries, affiliates, parent companies, guarantors, indemnitors, successors or assigns

of any of them for the Term [of one year] ("Forbearance") .... Further, City and Surety agree that notwithstanding the Forbearance agreed herein, this Agreement preserves and extends any and all rights or causes of action and tolls all defenses and statute of limitations arising out of or derived from the Bonds.

(Doc. 45–18) Each party retained the right to terminate the agreement upon sixty days' written notice.

In August, 2008, Key Bank purchased the property at a foreclosure sale, and on January 6, 2009, Key Bank assigned the property to OREO Corp. of Ohio. On November 17, 2008, the City notified Westchester that the City planned to terminate the Forbearance Agreement on January 16, 2009. On January 16, 2009, Westchester filed the present action for a declaration of the parties' rights and obligations under the bonds.

In May, 2009, while the present action was pending, OREO Corp. agreed to sell the Cascades to Kolter Group, LLC, for approximately $1.4 million. During the "due diligence" inquiry before closing, Kolter's president, Jim Harvey, learned of the City's claim to foreclose the bonds. Harvey contacted the City's lawyer, who responded in a June 5, 2009, letter, which states:

> As per our telephone conversation on Wednesday, June 03, 2009, I offer the following in reply to your questions regarding the planned development project known as Cascades at Southern Hills.
>
> Phase One of the project is completed except with respect to a few outstanding performance and maintenance obligations including a second lift of asphalt and certain sidewalk improvements. Land clearing and other earthwork was commenced on Phase Two of the pro-

ject, but no other construction has occurred.

Given the state of both Phase One and Phase Two of the project, the City is pursuing collection on performance and payment bonds issued to the City as a condition of final plat approval.

The City will file suit, within the next week, on the performance and payment bonds issued by Bond Safeguard Insurance Company with respect to the Phase One outstanding improvements. The City filed suit against Westchester Fire Insurance Company with respect to the performance and payment bonds for Phase Two. The infrastructure improvements in Phase Two are necessary for the overall plan to provide water and wastewater services to the area. With respect to the Phase Two bond litigation, mediation is scheduled to occur in August, 2009, and a trial date has been set for March, 2010. Copies of the complaints are enclosed.

On the condition that a developer acquires the project as-is and is willing to post performance and payment bonds as was required for the plat approval, the City is amenable to considering certain modifications to the Utility Services Agreement (USA). However, please note that any modifications to the utility services agreements require City Council approval.

. . . .

You inquired as to what the process is to seek modifications on the Utility Service Agreement. A typical process is that once a USA is negotiated it is submitted to the City Council for approval. Items to be submitted to the Council should be submitted at least two weeks prior to the next Council meeting, e.g. for an item to be placed on the agenda for City Council's consideration at the July 6, 2009, City Council meeting the item would have to be submitted to the City no later than June 19, 2009.

(Doc. 45–3) Harvey responded the next day by email:

When we spoke the other day, I do not recall you mentioning that the City's willingness to renegotiate the Utility Services Agreement for the Cascades property was contingent upon the existing bonds securing the Ph 1 and Ph 2 plat being replaced by a new owner. This would never be acceptable to my group nor Key Bank who is selling the property and will be executing the new Utility Services Agreement. A new Utility Services Agreement is critical to any new property owner moving forward with the project. The City will need to continue to pursue its rights under the existing surety bonds to assure that the infrastructure is provided for in the plats as required by City ordinances. If the City is not willing to move forward with the Utility Services Agreement modification, I think no one will be willing to purchase the property with its current obligations and the property will continue to sit fallow and begin to deteriorate significantly as I know that Key Bank is no longer interested in pumping money into the project.

I am available to discuss this matter with you or any other City official as soon as possible, as time is of the essence with the proposed transaction. I am working on the proposed modifications to the Utility Service Agreement with the hope that the City is willing to move forward with a new agreement without the contingency noted above.

(Doc. 45–4)

In July, 2009, without notifying Westchester, the City and OREO Corp. executed an "Amended and Restated Utility Service Agreement" (Doc. 45–6). The amended agreement acknowledges the City's claim to foreclose the performance bonds for Phase Two and states:

OWNER acquired fee simple title to the Property in reliance upon the existence and terms of the Bond, which ensure payment to the CITY to enable the CITY to construct the infrastructure secured thereby if Levitt failed to do so, and OWNER valued its acquisition of the Property in consideration of the value of the Bond and the committed improvements.

(Doc. 45–6 at 3) Paragraph thirteen of the amended agreement provides:

The respective duties and obligations of the parties herein shall be suspended while and so long as performance thereof is prevented or impeded by any cause outside the control of such parties, including ... the CITY'S inability to recover or receive the Bond Funds under the Bonds to fund the construction of the Public Works Improvements necessary to provide service to Phase Two of the DEVELOPMENT.

Finally, paragraph seventeen of the amended agreement states:

The CITY agrees to provide water and wastewater utility capacity and service only for Phases One and Two of the DEVELOPMENT, the plats for which are recorded ... in the Public Records ..., provided, however, that the CITY'S commitment to provide service (but not treatment capacity) to Phase Two is contingent upon the CITY'S recovery and receipt of the Bond funds to enable the construction of the Public Works Improvements ....

(Doc. 45–6 at 7–8) A limited liability company named CaSHP2 now owns Phase Two.

The current owner of Phase One has recently sold some of the completed and partially completed homes in Phase One. However, Phase Two remains undeveloped. Harvey estimates that construction of homes on Phase Two will not begin for another three years. (Doc. 46–3 at 14) In an email, Jim Greer, a principal of CaSHP2, predicts that the development of Phase Two will not commence for at least several years:

The mass grading for phase 2 is done. The horizontal improvements will cost approximately $5 million. The city is in litigation with the bonding company (depositions and discovery are under way) to collect the bonds (about $5 million) and install the improvements. There will be another $1 million or so in cost to the developer for electric, gas, phone and cable, landscaping and common areas and any soft costs not covered by the bonds. I haven't even looked at any requirements for buffering along the west border. The permits are probably in limbo but I would expect that the city will reinstate them automatically if they are doing the work. There is a commitment for sewer and water for the Phase and all other conditions for development have been met as far as I know. The plat is of record and the common areas shown on the plat have been dedicated and conveyed to the Residents' Association.

If the City is unsuccessful in recovering the bonds, there is no chance that the improvements will even be started in the foreseeable future. The cost to improve the lots, $30K plus each, exceeds the current market value of the lots. Given an average hold time of 6 years for lots in phase 2 (assumes absorption of 40–50 units per year) it is easy to imagine that the cost to finish and hold the lots will exceed their value even if the City is successful.

Hold cost[s] include taxes, insurance, cdd debt, cdd O & M and lot maintenance.

There are probably more considerations but it is my personal opinion that the best bet for this property is a recovery

of the bonds, followed by a mutual agreement with the City regarding the timing of the work on improvements, interim agricultural use and a timely roll out of lots between 2013 and 2017 (or as the market dictates).

With proper management of interim use, development and cost control, the phase is viable.

The odds of that happening are, maybe, 50–50. . . .

(Doc. 45–21) The City has neither attempted to construct the improvements nor solicited bids to establish the expected cost of construction. No City resident has requested the construction of the Phase Two Improvements, and no home exists that requires the City's utility services. The City has not asked CaSHP2 to construct the improvements. No party disputes that the cost to improve each lot exceeds the value of the lot.

### Discussion

■■■■■ "Suretyship is a contractual relationship resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal." 28 Fla. Jur.2d *Guaranty & Suretyship* § 64 (2010). A surety bond "is a contract, and, therefore, a bond is subject to the general law of contracts. The intent of the parties to the contract should govern the construction of a contract." *American Home Assur. Co. v. Larkin General Hosp., Ltd.,* 593 So.2d 195, 197 (Fla.1992). Because Westchester received compensation for the bonds, the bonds are strictly construed against Westchester and in favor of the City. *Sessions v. Willard,* 126 Fla. 848, 172 So. 242 (1937).

The present transaction resembles many others conceived during the height of the Florida real estate boom. As Judge Carnes writes in *Stein v. Paradigm Mirasol, LLC,* 586 F.3d 849, 852 (11th Cir.2009):

In a market-based economy the price of housing, like other goods, is subject to swings. There was a sharp upward swing in housing prices between late 2000 and the end of 2005, and the resulting bubble was bigger in Florida than it was in most other states. Home prices there rose eighty-two percent in absolute terms during that short period, outstripping the national increase by thirty-one percent. *See* Gabriel Montes Rojas et al., *The Florida Housing Boom,* 3 Fla. Focus 1, 2 (2007). All bubbles eventually burst, as this one did. The bigger the bubble, the bigger the pop. The bigger the pop, the bigger the losses. And the bigger the losses, the more likely litigation will ensue.

Levitt, the City, and Westchester entered into the present transaction in 2005 at the zenith of Florida's housing bubble. The documents in the transaction evidence the mania and urgency of the bubble. Although millions of dollars were at stake in the development of the project, the contracts at issue—the bonds issued by Westchester—comprise only one page and fail to specify many terms that would clarify the parties' rights and obligations after the bubble burst. But like many people involved in the real estate bubble, the parties apparently never contemplated a dramatic downturn.

Although the documents are incomplete and conflict, the parties persist in an "all or nothing" posture. The City seeks the face value of the bonds; Westchester maintains that the City is entitled to nothing. Westchester argues that the City seeks a windfall and must construct the Phase Two Improvements before seeking indemnity; the City promises to construct the improvements as soon as the City receives the money from Westchester. In light of the incomplete and conflicting documents, each party's position is reasonable.

The City argues that Westchester remains liable under the literal terms of the bonds because Levitt failed to construct the improvements and the City demanded payment. The City argues that neither the bonds nor the City ordinance requires the construction of the Cascades to trigger Westchester's obligation under the bonds. According to the City, the bonds require Westchester, upon Levitt's default, to pay the City for the cost of construction of the improvements.

Westchester argues that no liability accrues under the bonds because (1) "the planned development was not constructed or even commenced"; (2) "the City has discharged Westchester's obligations by materially altering the agreements on which the bonds are based (eliminating the obligation of the property owner to construct the improvements)"; (3) "the property has a new owner which, but for the City's dispensation, would have been subject to the recorded final plat requiring it to construct the improvements if building pursuant to the Plat"; (4) "the new owner would be unjustly enriched if Westchester is found liable on the bonds"; and (5) "the City cannot establish recoverable damages."

Westchester's second, third, and fourth arguments fail because each argument relies on facts arising more than eighteen months after Westchester refused payment on the bonds. Westchester may not delay performance, refuse to pay, and complain that subsequent events relieved Westchester's initial breach by refusing to pay. However, Westchester's first and fifth arguments merit further consideration. First, although no document requires the commencement of Phase Two, the installation of the improvements is subject to "an implied or constructive con-

dition that those improvements [are] required only if the developer proceeded with the project contemplated by the application and approval." *River Vale Planning Bd. v. E & R Office Interiors, Inc.,* 241 N.J.Super. 391, 575 A.2d 55, 59–60 (N.J.Super.App.Div.1990). Neither party disputes that construction of the development will not commence for several years (if at all). Requiring Westchester to pay for improvements for a residential development that may never be built is both unreasonable and conflicts with the purpose of the City's ordinance requiring the posting of a bond. Second, because the City incurred no expense building the improvements and because the City neither retains an obligation to build the improvements nor plans to build the improvements in the near future, the City suffers no damage from Westchester's refusal to pay on the bonds.

### A. Failure of an Implied Condition that the Development Proceed Before the City Can Collect

If the surety posts a bond in accord with an ordinance, the obligations of the surety must conform to the purpose and obligations imposed by the ordinance. *See Glades County, Fla. v. Detroit Fidelity & Sur. Co.,* 57 F.2d 449, 451 (5th Cir.1932) (applying Florida law).[1] Although, as the City argues, the literal terms of the bond impose no condition (other than Levitt's default) on Westchester's obligation to pay, the bonds and the ordinance construed together impose a condition that construction of the development proceed before the City may collect.

For example, in *River Vale Planning Bd. v. E & R Office Interiors, Inc.,* 241 N.J.Super. 391, 575 A.2d 55, 59–60 (N.J.Super.App.Div.1990), a developer pe-

---

1. *See also Loveland v. Lazzara,* 219 So.2d 74, 76 (Fla. 2d DCA 1969) ("[W]hen a bond is required by law such bond must be construed in the light of such law and the purpose of said bond is to accomplish the objectives of the law.").

titioned the town's zoning board for a variance to construct a multi-tenant industrial complex on property zoned for single-tenant use. As a condition of the board's approving the final site plan, the developer posted a cash performance bond to ensure the installation of public improvements required as part of the site plan. The developer abandoned the project before commencing construction of any building or improvement required by the site plan. The developer sued the planning board to recover the cash bond. Noting that the municipality remained "free to rescind the site plan approval in its entirety or to impose [the public improvement] conditions on any occupier of the land who seeks to obtain the benefit of the site plan approval," *River Vale*, 575 A.2d at 59–60, affirms summary judgment for the developer:

> [T]he installation of the improvements contemplated by the Developer's Agreement as a condition of site plan approval was subject to an implied or constructive condition that those improvements were required only if the developer proceeded with the project contemplated by the application and approval. The Developer's Agreement was entered into as part of the approval process of [the developer's] site plan application. Once his application had been abandoned, there was no need for the developer to proceed under the agreement and no burden placed on the municipality because of increased facilities or higher density use. [The developer] gave up the benefits and the burdens of the agreement. Since the site plan is not going to proceed as proposed, the municipality may not enforce that agreement.

In the present case, the City ordinance requires the bonds to ensure that no resident purchases a home without access to the City's utility services. Because no home has been built that requires the City's utility service and because no home

will be built for at least several years, the implied condition fails.

**B. Requiring Westchester to Pay Effects an Unreasonable Confiscation on Westchester and an Unreasonable Windfall to the City**

The interpretation of a contract must comport "with reason, probability, and the practical aspect of the transaction between the parties." *Whitley v. Royal Trails Property Owners' Ass'n, Inc.*, 910 So.2d 381, 383 (Fla. 5th DCA 2005). In *County of Yuba v. Central Valley National Bank*, 20 Cal.App.3d 109, 97 Cal.Rptr. 369 (Cal.Ct.App.1971), a developer planned to build a residential subdivision on unimproved, agricultural land. The county required the developer to obtain from the bank a surety agreement securing the developer's construction of public works in accord with the subdivision plan. Failing to obtain financing, the developer abandoned the project before beginning construction or development of the land. The county sued the bank to recover on the surety agreement. Affirming summary judgment for the bank, *Yuba*, 97 Cal.Rptr. at 369, holds:

> [S]ince the purpose for requiring security for street improvement work is to insure faithful performance of a subdivider's obligation to place streets in a proper condition for use by the public, no purpose is served by construing a security instrument to relate to construction of streets where development of neither the subdivision nor the streets has ever commenced.... [T]he underlying contract itself demonstrates that the sole basis for the relationship between County, [the developer], and Bank was the development of Tract 131 as a residential subdivision. All of the parties' transactions must therefore be construed with reference to this basic purpose.

Noting the absence of damage to the county, *Yuba* concludes that "to permit recovery in the circumstances of this case would be to uphold an 'illegal forfeiture.'" 97 Cal.Rptr. at 369.

In the present case, the City's ordinance requires the posting of a bond "to ensure that future owners [will] be able to connect their lots to the City's utility services." (Doc. 45–6 at 3) Levitt abandoned the Cascades before beginning construction on Phase Two. The Phase Two land remains unimproved, and no home exists that requires the City's utility services. Because no homeowner exists in Phase Two for whom the City must ensure the availability of utility services, requiring payment on the bonds both creates a cash windfall[2] for the City and fails to achieve the purpose of the City's ordinance. Because no home exists in Phase Two that requires the City's utility services, requiring the City to install improvements on undeveloped land (and requiring Westchester to reimburse the City's cost to install the improvements) imposes an unreasonable forfeiture against Westchester and promotes an unreasonable windfall for the City. *See City of Peekskill v. Continental Ins. Co.*, 999 F.Supp. 584, 586 (S.D.N.Y.1998) ("Because [the developer] completed no aspect of the development ... that would require the completion of the public improvements covered by the Bond, [the surety] has incurred no liability to the City.").

**2.** At the July 22, 2010, hearing (transcript at 47–48) on the motions for summary judgment, the City's counsel admitted the City's potential to receive a windfall in this case:
[City]: [I]f in the context of litigation the parties decide that the surety is liable on the funds, to pay on the bond, there can be a certified engineer ... statement from a professional engineer that the improvements have been completed.
[Court]: Well, that's if they're built?
[City]: That's if they are built.

## C. The City Suffered No Damage

■ The terms of the bond determine the liability of the surety. *DCC Constructors, Inc. v. Randall Mechanical, Inc.*, 791 So.2d 575, 576 (Fla. 5th DCA 2001). As stated in *Crabtree v. Aetna Cas. and Sur. Co.*, 438 So.2d 102, 105 (Fla. 1st DCA 1983):

A general principle of suretyship is that the liability of the surety is ordinarily measured by, and coextensive with, the liability of the principal or obligor.... A surety on a bond does not undertake to do more than that expressed in the bond, and has the right to stand upon the strict terms of the obligation as to his liability thereon. Generally, the owner-obligee named in a bond may maintain an action thereon, and the owner-obligee's right to recover is dependent upon the terms of the bond and the ability to establish that damages were suffered under such terms.

"The measure of recovery under a performance bond is the amount actually and reasonably expended in completing the duties under the bonded contract." 8 *Florida Practice Series, Construction Law Manual* § 10:3 (2009–2010); *see also* § 627.756, *Florida Statutes* (2010) ("A surety who issues a bid, performance, or payment bond in connection with construction activities where hazardous substances exist or are discovered is liable ... only for the cost of completion of the contract work in accordance with the plans and

[Court]: Okay, ... and my question was, if they're not? .... Is this a, as characterized, just a windfall for the City?
[City]: Well, to the extent that the funds are not used for the actual construction of the improvements—
[Court]: That's the contingency I was asking you about.
[City]: Then—yes, it would be.
[Court]: A windfall?
[City]: Yes.

specifications, less the balance of funds remaining to be paid under the contract, up to the penal sum of the bond.").

■ Surety bonds partition into penalty bonds and indemnity bonds. *General Ins. Co. of Am. v. City of Colorado Springs*, 638 P.2d 752, 757 (Colo.1981). If the principal defaults on a penalty bond, the obligee recovers the face value (the penalty) of the bond regardless of the damage incurred by the obligee. *See, e.g., Clark v. Barnard*, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883). If the principal defaults on an indemnity bond, the face value of the bond establishes the obligee's maximum recovery, and the obligee may recover only the actual damage incurred. *United States v. Zerbey*, 271 U.S. 332, 46 S.Ct. 532, 70 L.Ed. 973 (1926). In other words, the surety agrees to reimburse the obligee for damage incurred as a result of the principal's default. Florida law requires payment of the penal sum of the bond only if the damage suffered by the obligee is not "capable of being liquidated in money":

> A bond conditioned to be void on the fulfillment by the principal of all of his duties is operative as a promise that either all those duties will be performed, or that the obligee will be indemnified within the limit of the penalty in the case of non-performance. Only in cases where the harm inflicted by the breach of a bonded obligation is not capable of being measured and liquidated in money will the penalty of the bond be enforced. In all other cases, the plaintiff's recovery will not exceed the amount of the injury that he proves.

*St. Paul Mercury Ins. Co. v. Dep't of State*, 581 So.2d 976, 977 (Fla. 1st DCA 1991); *see also* 11 *Couch on Insurance* § 163:9 (3d ed. 2010) ("As a fundamental principle, the amount of the bond, its 'penal sum,' is not treated as an amount of 'liquidated damages' to be awarded for any breach by the principal; rather, the penal sum states the maximum amount for which the surety agrees to be held responsible .... [W]hen the principal's breach of duty causes less damage than the penal sum, the aggrieved bond claimant is entitled only to the amount of actual damage."). Stated differently, "The measure of recovery under a performance bond is the amount actually and reasonably expended in completing the duties under the bonded contract." 8 *Florida Practice Series, Construction Law Manual* § 10:3 (2009–2010); *see also* § 627.756, *Florida Statutes* (2010) ("A surety who issues a bid, performance, or payment bond in connection with construction activities where hazardous substances exist or are discovered is liable ... only for the cost of completion of the contract work in accordance with the plans and specifications, less the balance of funds remaining to be paid under the contract, up to the penal sum of the bond."); *Union Indemn. Co. v. Vetter*, 40 F.2d 606, 608 (5th Cir.1930) ("The undertaking of the principal, which was secured by the surety, being to indemnify the obligee against pecuniary loss, in order for the obligee to recover for a breach of the bond, he must show that he sustained a pecuniary loss by a breach of the contract.").

■ In the present case, the bonds require Westchester to pay "[i]f the Developer fails to complete the required improvements in accordance with the City Approvals, applicable regulations, and this agreement." (Doc. 45–16) Although the bonds mention no additional requirement for Westchester's obligation to pay, the pertinent "applicable regulation"—Section 129–3(c) of Chapter 29 of the City of Brooksville Code of Ordinances—provides, "The surety shall be subject to the condition that the improvements will be completed within 12 months after approval of the final plat and if they are not completed, the city shall proceed with the work

and hold the owner and the bonding company jointly responsible for the costs thereof...." (Doc. 30–4 at 5) The City concedes failing to "proceed with the work"; the City has neither attempted to construct the improvements nor solicited bids to establish the expected cost of construction. (Doc. 59 at 6) No City resident has requested the construction of the Phase Two Improvements (because no home exists in Phase Two that would require the City's utility services), and the City has not asked CaSHP2 to construct the improvements. The City retains no obligation to construct the improvements. At the hearing, counsel admitted that the City's recovery on the bonds could result in a windfall to the City. Failing to commence construction of the Phase Two Improvements (or even to solicit bids to estimate the potential construction cost), the City suffers no damage.

## Conclusion

No salutary purpose is achieved by requiring Westchester to pay $5.3 million to the City's general fund. Westchester incurs no obligation under the bonds because Levitt abandoned Phase Two before commencement and the successor developer will not develop the plat in the near future. Requiring Westchester to pay under the present circumstances both is unreasonable and conflicts with the purpose of the City's ordinance requiring the posting of a performance bond. Furthermore, The City has suffered no damage and is not obligated to construct the Phase Two Improvements. Notwithstanding that the City's ordinances, the plat, and the original Utility Services Agreement require Levitt and his successors to build the Phase Two Improvements, the City agreed to construct the improvements, but only if the City collects from Westchester. The true beneficiary of the City's recovery in this case remains CaSHP2. If CaSHP2 wishes to develop Phase Two, the City can require

CaSHP2 to bear the cost of development, as required by the City's ordinances. *See* Section 86–280, City of Brooksville Code of Ordinances ("Water and sanitary sewer line extension costs shall be borne by the person applying for such service ...."). If the market recovers and the development of Phase Two becomes financially feasible, CaSHP2 and City may proceed under the plat. But the City and CaSHP2 may not use Levitt's bankruptcy as a mechanism to transfer to Westchester the financial obligation to fund improvements on otherwise undeveloped land solely to render the development profitable to CaSHP2.

Westchester's motion (Doc. 49) for summary judgment is **GRANTED,** and the City's motion (Doc. 51) for summary judgment is **DENIED.** Westchester's motion (Doc. 44) for sanctions is **DENIED AS MOOT.** The Clerk is directed to (1) enter judgment in favor of Westchester and against the City on both Westchester's claim for declaratory judgment and the City's counterclaim, (2) terminate any pending motion, and (3) close the case.